## ITEL CONTAINERS INTERNATIONAL CORP. *v.* HUDDLESTON, COMMISSIONER OF REVENUE OF TENNESSEE

No. 91–321.   Argued October 14, 1992—Decided February 23, 1993

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, STEVENS, O'CONNOR, SOUTER, and THOMAS, JJ., joined, and in all but Parts IV and V of which SCALIA, J., joined.  SCALIA, J., filed

an opinion concurring in part and concurring in the judgment, *post*, p. 78. BLACKMUN, J., filed a dissenting opinion, *post*, p. 82.

*Philip W. Collier* argued the cause for petitioner. With him on the briefs were *Andrew L. Frey, Charles Rothfeld,* and *Lisa D. Leach.*

*Charles W. Burson,* Attorney General of Tennessee, argued the cause for respondent. With him on the brief were *John Knox Walkup,* Solicitor General, and *Daryl J. Brand,* Assistant Attorney General.

*Edwin S. Kneedler* argued the cause for the United States as *amicus curiae* urging affirmance. On the brief were *Solicitor General Starr, Acting Assistant Attorney General Bruton, Deputy Solicitor General Wallace, Kent L. Jones, Gary R. Allen,* and *Ernest J. Brown.**

JUSTICE KENNEDY delivered the opinion of the Court.

In this case we consider the validity of a state tax affecting cargo containers used in international trade, a subject we have addressed once before. See *Japan Line, Ltd.* v. *County of Los Angeles,* 441 U. S. 434 (1979). We sustain Tennessee's sales tax on leases of containers owned by a domestic company and used in international shipping.

## I

The use of large steel containers to transport goods by truck, rail, and oceangoing carrier was a major innovation in transportation technology. In 1990, the United States shipped, by value, 60% of its marine imports and 52% of its marine exports in these containers. Itel Containers Inter-

---

*Briefs of *amici curiae* urging reversal were filed for the United Kingdom of Great Britain and Northern Ireland by *William Karas* and *David H. Coburn;* for Asia North America Eastbound Rate Agreement et al. by *Stanley O. Sher* and *David F. Smith;* and for the Institute of International Container Lessors et al. by *Thomas S. Martin* and *Edward A. Woolley.*

*R. Frederic Fisher, Barry J. London,* and *Lawrence N. Minch* filed a brief for the Pacific Merchant Shipping Association et al. as *amici curiae.*

national Corporation, the petitioner here, is a Delaware corporation with its principal place of business in California. Itel's primary business is leasing cargo containers to participants in the international shipping industry, and all its leases restrict use of its containers to international commerce. The leases are solicited and negotiated through Itel marketing offices in California, Illinois, New Jersey, South Carolina, Texas, and Washington, and the leased containers are delivered to lessees or their agents in many of the 50 States, including Tennessee. The Tennessee deliveries occur either at Itel's Memphis terminal or at several designated third-party terminals.

In December 1986, the Tennessee Department of Revenue assessed $382,465 in sales tax, penalties, and interest on the proceeds Itel earned from leased containers delivered in Tennessee for the period of January 1983 through November 1986. Itel paid under protest and filed an action for a refund, challenging the constitutionality of the Tennessee tax under the Commerce Clause, the Import-Export Clause and the Supremacy Clause. The last challenge to the tax was based on an alleged conflict both with federal regulations and with two international conventions to which the United States is a signatory. Customs Convention on Containers, Dec. 2, 1972, [1975] 988 U. N. T. S. 43 (hereinafter 1972 Container Convention); Customs Convention on Containers, May 18, 1956, [1969] 20 U. S. T. 301, T. I. A. S. No. 6634 (hereinafter 1956 Container Convention). The Tennessee Chancery Court reduced the assessment to $158,012 on state-law grounds but rejected Itel's constitutional claims.

On appeal to the Supreme Court of Tennessee, Itel maintained that the Tennessee tax is pre-empted by the Container Conventions and their implementing federal regulations. The court concluded, however, that congressional regulation of cargo containers is not pervasive and that Congress has not otherwise acted to bar state sales taxes on cargo container leases. *Itel Containers Int'l Corp.* v. *Card-*

*well,* 814 S. W. 2d 29, 34 (1991). Instead, the court held, Congress merely prohibits the imposition of federal customs duties on containers, and that prohibition does not pre-empt Tennessee's sales tax, which is not a customs duty. *Id.,* at 35–36.

Itel also claimed that Tennessee's tax violates the Foreign Commerce Clause principles announced in *Japan Line, Ltd.* v. *County of Los Angeles, supra,* because the tax "prevents the Federal Government from 'speaking with one voice when regulating commercial relations with foreign governments'" and "creates a substantial risk of international multiple taxation." *Id.,* at 451. The state court rejected this argument because the tax is imposed only upon a discrete transaction— the transferred possession of cargo containers within Tennessee—and therefore does not risk multiple taxation or impede federal regulation of foreign trade. 814 S. W. 2d, at 36–37.

Last, Itel argued that the tax violates the Import-Export Clause because it prevents the Federal Government from speaking with one voice in international affairs and is a tax on exports that is *per se* impermissible under *Richfield Oil Corp.* v. *State Bd. of Equalization,* 329 U. S. 69 (1946). The court dismissed Itel's one voice argument for reasons similar to those given in its Commerce Clause analysis, 814 S. W. 2d, at 38, and held the Tennessee tax does not violate *Richfield*'s *per se* restriction because it is not a direct tax on the value of goods destined for export. 814 S. W. 2d, at 33. We granted certiorari, 502 U. S. 1090 (1992), and now affirm.

II

Itel's primary challenge is that the imposition of the Tennessee sales tax is proscribed by both the 1972 and 1956 Container Conventions. The Conventions restrict the authority of signatories to tax cargo containers by requiring signatory nations to grant the containers "temporary admission" into their borders, subject to exportation "within three months

from the date of importation" unless this period is extended by customs authorities. 1972 Container Convention, Arts. 3 and 4; 1956 Container Convention, Arts. 2 and 3. Temporary admission status permits the containers to enter a nation "free of import duties and taxes" under the 1972 Convention and "free of import duties and import taxes" under the 1956 Convention. 1972 Container Convention, Art. 1; 1956 Container Convention, Art. 2.

The Conventions define these key phrases in similar terms. The 1972 Convention defines "import duties and taxes" to mean "Customs duties and all other duties, taxes, fees and other charges which are collected on, or in connexion with, the importation of goods, but not including fees and charges limited in amount to the approximate cost of services rendered." 1972 Container Convention, Art. 1. The 1956 Convention defines "import duties and import taxes" to mean "not only Customs duties but also all duties and taxes whatsoever chargeable by reason of importation." 1956 Container Convention, Art. 1. Itel does not claim the Tennessee sales taxes on its container leases is a "Customs dut[y]" under either Convention. Rather, it says that because its containers would not be available for lease, and hence taxation, in Tennessee but for their importation into the United States, the Tennessee tax must be a tax "collected on, or in connexion with, the importation of goods" in contravention of the 1972 Convention and a tax "chargeable by reason of importation" in contravention of the 1956 Convention.

We cannot accept Itel's interpretation of the Container Conventions. Our interpretation must begin, as always, with the text of the Conventions. See *Air France* v. *Saks*, 470 U. S. 392, 397 (1985). The text, instead of supporting Itel's broad construction, makes clear that it is the reason a State imposes a tax, not the reason for the presence of the containers within a State's jurisdiction, that determines whether a tax violates the Container Conventions. The

Conventions thus disallow only those taxes imposed based on the act of importation itself. In contrast, Itel's interpretation would bar all taxes on containers covered by the Conventions, because each covered container is, by definition, in the United States as a result of its temporary importation. This reading makes superfluous the Conventions' qualifying language that the only taxes proscribed are those "collected on, or in connexion with, the importation of goods" and those "chargeable by reason of importation." 1972 Container Convention, Art. 1; 1956 Container Convention, Art. 1.

In an attempt to counteract the interpretation that the Conventions prohibit only those taxes based on the importation of containers, Itel asserts that the consistent practice of other signatory nations and a prior interpretation of the 1956 Convention by the United States prove that signatory nations read the Conventions to proscribe all taxes on containers within their borders. See *Factor* v. *Laubenheimer*, 290 U. S. 276, 294–295 (1933). Itel, however, overstates the probative value of these actions.

As evidence that other signatory nations free cargo containers of all domestic taxation, Itel places primary reliance on the Economic Community Sixth Directive and the United Kingdom Value Added Tax (VAT), as illuminated in an *amicus* brief filed by the United Kingdom. Brief for United Kingdom of Great Britain and Northern Ireland as *Amicus Curiae* 7–9. Under the European VAT system, no direct tax, be it a VAT, sales, or use tax, is imposed on the value of international container leases. See Sixth Council Directive of May 17, 1977, Arts. 14(1)(i) and 15(13), reprinted in CCH Common Mkt. Rep. ¶¶ 3165P and 3165Q.

The value of international container leases, however, is included in the cost of transporting goods, which in turn is added to the value of the goods when calculating VAT tax liability. Itel admits this is tantamount to an indirect tax on the value of international container leases, but claims the distinction between an indirect tax (paid by the consumer of

import goods) and a direct tax on the container itself (paid by either the lessor or lessee of the container) is significant. Whether or not, in the abstract, there is a significant difference between direct and indirect taxation, the Container Conventions do not distinguish between the two methods or differentiate depending upon the legal incidence of a tax. For example, the first declaration in both Convention Protocols of Signature states that inclusion of the weight or value of containers in the weight or value of goods for calculating import duties and taxes upon those goods conflicts with the Conventions, even though this would be only an indirect tax on the containers and the legal incidence of the tax would not fall on the container lessor or lessee. 1972 Container Convention, Protocol of Signature, [1975] 988 U. N. T. S., at 74; 1956 Container Convention, Protocol of Signature, [1969]. 20 U. S. T., at 326. The Conventions, in short, prohibit both direct and indirect taxes imposed based on the importation of a container, but permit direct and indirect taxes imposed on some other basis.

As further evidence in support of its position, Itel points to the statements of signatory nations objecting to Tennessee's taxation of container leases. With all due respect to those statements, we adhere to our interpretation. We are mindful that 11 nations (Denmark, Finland, France, Germany, Italy, Japan, the Netherlands, Norway, Spain, Sweden, and the United Kingdom), each a signatory to at least one Container Convention, have sent a diplomatic note to the United States Department of State submitting that they do not "impose sales taxes (or equivalent taxes of different nomenclatures) on the lease of cargo containers that are used in international commerce among the Contracting Parties to the Conventions." App. to Brief for United Kingdom of Great Britain and Northern Ireland as *Amicus Curiae* 1a. The meaning these nations ascribe to the phrase "equivalent taxes" is not clear. For purposes of calculation and assessment, the European VAT system, enacted in most of the

objecting nations, is by no means equivalent to a sales tax. See *Trinova Corp.* v. *Michigan Dept. of Treasury,* 498 U. S. 358, 365–366, n. 3 (1991). But as we discussed above, for the purpose of determining whether a tax is one based on importation, the European VAT system is equivalent to Tennessee's sales tax system—that is, neither system imposes a tax based on the act of importation. Only this latter form of equivalence is relevant under the Container Conventions.

Directing our attention to the *amicus* brief filed by the United States in *Japan Line, Ltd.* v. *County of Los Angeles,* 441 U. S. 434 (1979), Itel next claims the United States Government once interpreted the 1956 Container Convention to prohibit all domestic taxes on international cargo containers. Even if this were true, the Government's current position is quite different; its *amicus* brief in this case expresses agreement with our interpretation of both the 1972 and the 1956 Container Conventions. Brief for United States as *Amicus Curiae* 12.

In its *amicus* brief in *Japan Line,* moreover, the United States did not say that the 1956 Container Convention prohibited the imposition of any domestic tax on international cargo containers. Its position was simply that under the 1956 Convention the United States gave containers "the same status it gives under the customs laws to articles admitted to a 'bonded manufacturing warehouse.'" Brief for United States as *Amicus Curiae* in *Japan Line, Ltd.* v. *County of Los Angeles,* O. T. 1978, No. 77–1378, p. 25 (quoting 19 U. S. C. § 1311). Starting from this premise the Government argued that, like state taxes on goods in customs bonded warehouses destined for foreign trade, see *McGoldrick* v. *Gulf Oil Corp.,* 309 U. S. 414, 428–429 (1940), state taxes on containers would frustrate a federal scheme designed to benefit international commerce. Brief for United States as *Amicus Curiae* in *Japan Line,* at 27–29, and n. 22. We declined, and continue to decline, to adopt this expansive view of *McGoldrick* and the pre-emptive effect of the Con-

tainer Conventions. See *infra*, at 70–71. And, in any event, the Government's pre-emption argument in *Japan Line* does not conflict with its present interpretation that the Container Conventions themselves are violated only by a tax assessed upon the importation of containers.

Tennessee's sales tax is imposed upon the "transfer of title or possession, or both, exchange, barter, lease or rental, conditional, or otherwise, in any manner or by any means whatsoever of tangible personal property for a consideration." Tenn. Code Ann. §67–6–102(23)(A) (Supp. 1992). It is a sales tax of general application that does not discriminate against imported products either in its purpose or effect. Indeed, its assessment bears no relation to importation whatsoever. The tax is not pre-empted by the 1972 or 1956 Container Convention.

## III

Itel next argues that the application of Tennessee's sales tax to its container leases is pre-empted because it would frustrate the federal objectives underlying the Container Conventions and the laws and regulations granting favored status to international containers, in particular 19 U. S. C. §1322 and 19 CFR §10.41a (1992). See *Hines* v. *Davidowitz*, 312 U. S. 52, 67 (1941) (state law pre-empted when it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"). The federal regulatory scheme for cargo containers, it claims, parallels the regulatory scheme creating customs bonded warehouses which we have found to pre-empt most state taxes on warehoused goods. *R. J. Reynolds Tobacco Co.* v. *Durham County*, 479 U. S. 130 (1986); *Xerox Corp.* v. *County of Harris*, 459 U. S. 145 (1982); *McGoldrick* v. *Gulf Oil Corp.*, *supra*.

Itel's reliance on these decisions is misplaced. In *McGoldrick* and its progeny, we stated that Congress created a system for bonded warehouses where imports could be stored free of federal customs duties while under the continuous

supervision of local customs officials "in order to encourage merchants here and abroad to make use of American ports." *Xerox Corp., supra,* at 151. By allowing importers to defer taxes on imported goods for a period of time and to escape taxes altogether on reexported goods, the bonded warehouse system "enabled the importer, without any threat of financial loss, to place his goods in domestic markets or to return them to foreign commerce and, by this flexibility, encouraged importers to use American facilities." *R. J. Reynolds Tobacco Co., supra,* at 147. This federal objective would be frustrated by the imposition of state sales and property taxes on goods not destined for domestic distribution, regardless of whether the taxes themselves discriminated against goods based on their destination. *Xerox Corp., supra,* at 150–154. See also *R. J. Reynolds Tobacco Co., supra,* at 144–147; *McGoldrick, supra,* at 428–429.

In contrast, the federal regulatory scheme for containers used in foreign commerce discloses no congressional intent to exempt those containers from all or most domestic taxation. In *Japan Line* we said that the 1956 Container Convention acknowledged "[t]he desirability of uniform treatment of containers used exclusively in foreign commerce" and "reflect[ed] a national policy to remove impediments to the use of containers." 441 U. S., at 452–453. But we did not hold that the Convention and the federal regulatory scheme for cargo containers expressed a national policy to exempt containers from all domestic taxation. Rather, we relied on the federal laws, along with proof of an international customary norm of home port taxation and California's creation of an asymmetry in international maritime taxation, for our conclusion that California's ad valorem property tax violated the Foreign Commerce Clause by impeding the Government's ability to " 'spea[k] with one voice' " in conducting our Nation's foreign affairs. *Ibid.*

Itel does not better its pre-emption argument by claiming that the federal regulatory scheme for containers, like the

customs bonded warehouse scheme, is so pervasive that it demonstrates a federal purpose to occupy the field of container regulation and taxation. We doubt that the container regulatory scheme can be considered as pervasive as the customs warehouse scheme. The latter provides for continual federal supervision of warehouses, strict bonding requirements, and special taxing rules, see 19 U. S. C. §§ 1555 and 1557; 19 CFR pt. 19 (1992), whereas the former is limited more to the general certification and taxing of containers, see 19 U. S. C. § 1322; 19 CFR §§ 10.41a and 115.25–115.43 (1992). Even if Itel were correct on this point, however, we have not held that state taxation of goods in bonded warehouses is pre-empted by Congress' intent to occupy the field of bonded warehouse regulation. In fact, in *R. J. Reynolds* we specifically held that the bonded warehouse statutes and regulations did not evidence such a purpose. 479 U. S., at 149. So, too, we cannot conclude that in adopting laws governing the importation of containers Congress intended to foreclose any and all concurrent state regulation or taxation of containers.

The precise federal policy regarding promotion of container use is satisfied by a proscription against taxes that are imposed upon, or discriminate against, the importation of containers. We find that Tennessee's general sales tax, which applies to domestic and foreign goods without differentiation, does not impede the federal objectives expressed in the 1972 and 1956 Container Conventions and related federal statutes and regulations.

## IV

### A

Itel's third challenge to Tennessee's tax on container leases is that the tax violates the Foreign Commerce Clause as interpreted by *Japan Line.* U. S. Const., Art. I, § 8, cl. 3. We began our analysis in *Japan Line* with a reformulation of the Foreign Commerce Clause test:

"In addition to answering the nexus, apportionment, and nondiscrimination questions posed in *Complete Auto* [*Transit, Inc.* v. *Brady,* 430 U. S. 274, 279 (1977)], a court must also inquire, first, whether the tax, notwithstanding apportionment, creates a substantial risk of international multiple taxation, and, second, whether the tax prevents the Federal Government from 'speaking with one voice when regulating commercial relations with foreign governments.'" 441 U. S., at 451.

Without passing on the point, we assumed the California property tax in question would have met the test of *Complete Auto Transit, Inc.* v. *Brady,* 430 U. S. 274 (1977). See 441 U. S., at 451. Proceeding to the two foreign commerce requirements we had identified, we found the California tax incompatible with both. We held that because Japan had the established right, consistent with the custom of nations, see *id.,* at 447, to tax the property value of the containers in full, California's tax "produce[d] multiple taxation in fact," *id.,* at 452. We held further that California's tax prevented the United States from speaking with one voice in foreign affairs, in that "[t]he risk of retaliation by Japan, under these circumstances, [was] acute, and such retaliation of necessity would be felt by the Nation as a whole." *Id.,* at 453.

Four years later we again addressed whether a California tax offended the Foreign Commerce Clause, this time in the context of a unitary business income tax. *Container Corp. of America* v. *Franchise Tax Bd.,* 463 U. S. 159 (1983). Although recognizing that California's income tax shared some of the same characteristics as the property tax involved in *Japan Line,* see 463 U. S., at 187, we nevertheless upheld it based on two distinguishing characteristics.

First, the problem of double taxing in *Container Corp.,* "although real, [was] not the 'inevitabl[e]' result of the California [income] taxing scheme." *Id.,* at 188 (quoting *Japan Line, supra,* at 447). On the other hand, "[i]n *Japan Line,* we relied strongly on the fact that one taxing juris-

diction claimed the right to tax a given value in full, and another taxing jurisdiction claimed the right to tax the same entity in part—a combination resulting necessarily in double taxation." 463 U. S., at 188. That the *Japan Line* Court adopted a rule requiring States to forgo assessing property taxes against foreign-owned cargo containers "was by no means unfair, because the rule did no more than reflect consistent international practice and express federal policy." *Container Corp., supra,* at 190.

Second, we noted that "in *[Container Corp.]*, unlike *Japan Line,* the Executive Branch ha[d] decided not to file an *amicus curiae* brief in opposition to the state tax." 463 U. S., at 195. Together with our conclusion that the California income tax did not result in automatic double taxation, the Government's nonintervention suggested that the tax presented no serious threat to United States foreign policy. See *id.,* at 196.

### B

Before reconciling the holdings of *Japan Line* and *Container Corp.,* we first address the *Complete Auto* test, a test we assumed, *arguendo,* was satisfied by the tax in *Japan Line.* 441 U. S., at 451. A state tax satisfies the *Complete Auto* Domestic Commerce Clause test "when the tax is applied to an activity with a substantial nexus with the taxing State, is fairly apportioned, does not discriminate against interstate commerce, and is fairly related to the services provided by the State." *Complete Auto, supra,* at 279. Because Itel accepts the Supreme Court of Tennessee's conclusion that "Tennessee's sales tax meets the four-fold requirements of *Complete Auto,*" 814 S. W. 2d, at 36, we need not retrace that court's careful analysis. We do note, however, that Tennessee's compliance with the *Complete Auto* test has relevance to our conclusion that the state tax meets those inquiries unique to the Foreign Commerce Clause. That the tax is a fair measure of the State's contacts with a given commercial transaction in all four aspects of the *Complete Auto* test

confirms both the State's legitimate interest in taxing the transaction and the absence of an attempt to interfere with the free flow of commerce, be it foreign or domestic.

## C

We proceed to evaluate the tax under *Japan Line's* two Foreign Commerce Clause factors. Left to decide whether Tennessee's tax rests on the *Japan Line* or the *Container Corp.* side of the scale, we have no doubt that the analysis and holding of *Container Corp.* control.

Itel asserts that Tennessee's law invites multiple taxation of container leases because numerous foreign nations have a sufficient taxing nexus with the leases to impose equivalent taxes, and many nations in fact would do so were it not for the Container Conventions' prohibitions. As an initial matter, of course, we have concluded that the Conventions do not prohibit Tennessee's sales tax or equivalent taxes imposed by other nations. To the extent Tennessee has invited others to tax cargo container leases, foreign sovereigns, in an exercise of their independent judgment, have chosen not to accept.

Furthermore, the Foreign Commerce Clause cannot be interpreted to demand that a State refrain from taxing any business transaction that is also potentially subject to taxation by a foreign sovereign. "*Japan Line* does not require forbearance so extreme or so one-sided." *Container Corp.*, *supra*, at 193. Tennessee has decided to tax a discrete transaction occurring within the State. See *Wardair Canada Inc.* v. *Florida Dept. of Revenue*, 477 U.S. 1, 9 (1986). And, according to its interpretation of its revenue code, which we accept, Tennessee credits against its own tax any tax properly paid in another jurisdiction, foreign or domestic, on the same transaction. Tenn. Code Ann. § 67–6–313(f) (1989). By these measures, Tennessee's sales tax reduces, if not eliminates, the risk of multiple international taxation. Absent a conflict with a "consistent international practice

[or] . . . federal policy," *Container Corp.*, 463 U. S., at 190, the careful apportionment of a state tax on business transactions conducted within state borders does not create the substantial risk of international multiple taxation that implicates Foreign Commerce Clause concerns.

Itel further claims that if other States in this country follow Tennessee's lead and tax international container leases, the United States will be unable to speak with one voice in foreign trade because international container leases will be subject to various degrees of domestic taxation. As a consequence, Itel insists, container owners and users will be hit by retaliatory foreign taxes. To the extent Itel is arguing that the risk of double taxation violates the one voice test, our response is the same as above: Tennessee's tax does not create the substantial risk of international multiple taxation that implicates Foreign Commerce Clause concerns.

To the extent Itel is arguing that taxes like Tennessee's engender foreign policy problems, the United States disagrees. The Federal Government, in adopting various conventions, statutes, and regulations that restrict a State's ability to tax international cargo containers in defined circumstances, has acted on the subject of taxing cargo containers and their use. It has chosen to eliminate state taxes collected in connection with the importation of cargo containers. The state tax here does not fall within that proscription, and the most rational inference to be drawn is that this tax, one quite distinct from the general class of import duties, is permitted. Unlike in *Japan Line* or *Container Corp.*, moreover, the United States has filed an *amicus* brief defending Tennessee's law: "Far from conflicting with international custom, the Tennessee tax appears to promote it. The Tennessee tax thus does not interfere with our ability 'to speak with one voice' on this issue involving foreign commerce." Brief for United States as *Amicus Curiae* 24. This submission "is by no means dispositive." *Container Corp.*, 463 U. S., at 195–196. But given the strong indica-

tions from Congress that Tennessee's method of taxation is allowable, and with due regard for the fact that the nuances of foreign policy "are much more the province of the Executive Branch and Congress than of this Court," *id.*, at 196, we find no reason to disagree with the United States' submission that Tennessee's tax does not infringe the Government's ability to speak with one voice when regulating commercial relations with other nations. "It would turn dormant Commerce Clause analysis entirely upside down to apply it where the Federal Government has acted, and to apply it in such a way as to *reverse* the policy that the Federal Government has elected to follow." *Wardair Canada, supra,* at 12.

## V

Itel's final avenue of attack on the Tennessee tax is that, as applied to international container leases, it violates the Import-Export Clause. U. S. Const., Art. I, § 10, cl. 2. Our modern Import-Export Clause test was first announced in *Michelin Tire Corp.* v. *Wages,* 423 U. S. 276, 285–286 (1976):

"The Framers of the Constitution . . . sought to alleviate three main concerns by committing sole power to lay imposts and duties on imports in the Federal Government, with no concurrent state power: [1] the Federal Government must speak with one voice when regulating commercial relations with foreign governments, and tariffs, which might affect foreign relations, could not be implemented by the States consistently with that exclusive power; [2] import revenues were to be the major source of revenue of the Federal Government and should not be diverted to the States; and [3] harmony among the States might be disturbed unless seaboard States, with their crucial ports of entry, were prohibited from levying taxes on citizens of other States by taxing goods merely flowing through their ports to the other States not situated as favorably geographically." *Ibid.* (footnotes omitted).

The first and third components in this formulation mirror inquiries we have already undertaken as part of our Foreign Commerce Clause analysis. That is, the one voice component of the *Michelin* test is the same as the one voice component of our *Japan Line* test. *Japan Line*, 441 U. S., at 449–450, n. 14. And the state harmony component parallels the four *Complete Auto* requirements of the Foreign and Domestic Commerce Clause. *Department of Revenue of Wash.* v. *Association of Wash. Stevedoring Cos.*, 435 U. S. 734, 754–755 (1978) ("The third Import-Export Clause policy . . . is vindicated if the tax falls upon a taxpayer with a reasonable nexus to the State, is properly apportioned, does not discriminate, and relates reasonably to services provided by the State"). Having concluded that the Tennessee tax survives Commerce Clause scrutiny, we must conclude the tax is consistent with the first and third component of our *Michelin* test.

This leaves only *Michelin*'s second component: ensuring that import revenues are not being diverted from the Federal Government. We need not provide a detailed explanation of what, if any, substantive limits this aspect of *Michelin* places on state taxation of goods flowing through international channels, for the tax here is not a tax on importation or imported goods, but a tax on a business transaction occurring within the taxing State. The tax does not draw revenue from the importation process and so does not divert import revenue from the Federal Government. For similar reasons, we reject the argument that the tax violates the prohibition on the direct taxation of imports and exports "in transit," the rule we followed in *Richfield Oil*, 329 U. S., at 78–79, 84. Even assuming that rule has not been altered by the approach we adopted in *Michelin*, it is inapplicable here. Tennessee's sales tax is levied on leases transferring temporary possession of containers to third parties in Tennessee; it is not levied on the containers themselves or on the goods being imported in those containers. The tax thus does not divert import revenue from the Federal Government because

"the taxation falls upon a service distinct from [import] goods and their value." *Washington Stevedoring, supra,* at 757. See also *Canton R. Co.* v. *Rogan,* 340 U. S. 511, 513–514 (1951).

## VI

For the reasons we have stated, we hold that Tennessee's sales tax, as applied to Itel's international container leases, does not violate the Commerce, Import-Export or Supremacy Clause. The judgment of the Supreme Court of Tennessee is affirmed.

*It is so ordered.*

JUSTICE SCALIA, concurring in part and concurring in the judgment.

I join all of the Court's opinion except those sections disposing of the petitioner's "negative" Foreign Commerce Clause and Import-Export Clause arguments (Parts IV and V, respectively). As to those sections, I concur only in the judgment of the Court.

I have previously recorded my view that the Commerce Clause contains no "negative" component, no self-operative prohibition upon the States' regulation of commerce. "The historical record provides no grounds for reading the Commerce Clause to be other than what it says—an authorization for Congress to regulate commerce." *Tyler Pipe Industries, Inc.* v. *Washington State Dept. of Revenue,* 483 U. S. 232, 263 (1987) (SCALIA, J., concurring in part and dissenting in part); see also *American Trucking Assns., Inc.* v. *Smith,* 496 U. S. 167, 202–203 (1990) (SCALIA, J., concurring in judgment). On *stare decisis* grounds, however, I will enforce a self-executing, "negative" Commerce Clause in two circumstances: (1) against a state law that facially discriminates against interstate commerce,[1] and (2) against a state law that

---

[1] See *Healy* v. *Beer Institute,* 491 U. S. 324, 344 (1989) (SCALIA, J., concurring in part and concurring in judgment); *New Energy Co. of Ind.* v. *Limbach,* 486 U. S. 269 (1988); *Trinova Corp.* v. *Michigan Dept. of Treas-*

is indistinguishable from a type of law previously held unconstitutional by this Court.[2]   These acknowledgments of precedent serve the principal purposes of *stare decisis*, which are to protect reliance interests and to foster stability in the law. I do not believe, however, that either of those purposes is significantly furthered by continuing to apply the vague and open-ended tests that are the current content of our negative Commerce Clause jurisprudence, such as the four-factor test set forth in *Complete Auto Transit, Inc.* v. *Brady*, 430 U. S. 274, 279 (1977), or the "balancing" approach of *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137 (1970).   Unlike the prohibition on rank discrimination against interstate commerce, which has long and consistently appeared in the precedents of this Court, see *New Energy Co. of Ind.* v. *Limbach*, 486 U. S. 269, 273 (1988), those tests are merely the latest in a series of doctrines that we have successively applied, and successively discarded, over the years, to invalidate nondiscriminatory state taxation and regulation—including, for example, the "original package" doctrine, see *Leisy* v. *Hardin*, 135 U. S. 100 (1890), the "uniformity" test, see *Case of the State Freight Tax*, 15 Wall. 232, 279–280 (1873); cf. *Cooley* v. *Board of Wardens of Port of Philadelphia ex rel. Society for Relief of Distressed Pilots*, 12 How. 299, 319 (1852), the "directness" test, see *Hall* v. *DeCuir*, 95 U. S. 485, 488–489 (1878), and the "privilege of doing interstate business" rule, see *Spector Motor Service, Inc.* v. *O'Connor*, 340 U. S. 602, 609 (1951). Like almost all their predecessors, these latest tests are so uncertain in their application (and in their anticipated life-

---

*ury*, 498 U. S. 358, 387 (1991) (SCALIA, J., concurring in judgment); *Amerada Hess Corp.* v. *Director, Div. of Taxation, N. J. Dept. of Treasury*, 490 U. S. 66, 80 (1989) (SCALIA, J., concurring in judgment); *American Trucking Assns., Inc.* v. *Scheiner*, 483 U. S. 266, 304 (1987) (SCALIA, J., dissenting).

[2] See *American Trucking Assns., Inc.* v. *Smith*, 496 U. S. 167, 204 (1990); *Quill Corp.* v. *North Dakota*, 504 U. S. 298, 320–321 (1992) (SCALIA, J., concurring in part and concurring in judgment).

span) that they can hardly be said to foster stability or to engender reliance deserving of *stare decisis* protection.

I have not hitherto had occasion to consider an asserted application of the negative Commerce Clause to commerce "with foreign Nations"—as opposed to commerce "among the several States"—but the basic point that the Commerce Clause is a power conferred upon Congress (and not a power denied to the States) obviously applies to all portions of the Clause. I assume that, for reasons of *stare decisis*, I must apply the same categorical prohibition against laws that facially discriminate against foreign commerce as I do against laws that facially discriminate against interstate commerce—though it may be that the rule is not as deeply rooted in our precedents for the former field. I need not reach that issue in the present case, since the Tennessee tax is nothing more than a garden-variety state sales tax that clearly does not discriminate against foreign commerce. As with the Interstate Commerce Clause, however, *stare decisis* cannot bind me to a completely indeterminate test such as the "four-factored test plus two" found in *Japan Line, Ltd.* v. *County of Los Angeles*, 441 U. S. 434, 446–451 (1979), which combines *Complete Auto* with two *additional* tests.

*Japan Line*, like *Complete Auto* and *Pike*, ultimately asks courts to make policy judgments—essentially, whether non-discriminatory state regulations of various sorts are "worth" their effects upon interstate or foreign commerce. One element of *Japan Line*, however, the so-called "speak with one voice" test, has a peculiar effect that underscores the inappropriateness of our engagement in this enterprise of applying a negative Commerce Clause. Applied literally, this test would always be satisfied, since no state law can ever actually "*prevent* this Nation from 'speaking with one voice' in regulating foreign commerce," *Japan Line, supra*, at 451 (emphasis added), or "interfere with [the United States'] *ability* 'to speak with one voice,'" Brief for United States as *Amicus Curiae* 24 (emphasis added). The National Govern-

ment can always explictly pre-empt the offending state law. What, then, does the "one voice" test mean? Today, the Court relies on two considerations in determining that Tennessee's tax passes it: (1) that federal treaties, statutes and regulations restrict a State's ability to tax containers in certain defined circumstances, and the state tax here does not fall within those proscriptions; and (2) that the Government has filed an *amicus* brief in support of the State. *Ante*, at 75–76. The first of these considerations, however, does not distinguish the ad valorem property tax invalidated in *Japan Line*, which would also not violate the Container Conventions or the relevant federal statutes and regulations as construed in today's opinion, *ante*, at 65–66, 71. The second consideration does distinguish *Japan Line*, and it thus appears that a ruling on the *constitutionality* of a state law ultimately turns on the position of the Executive Branch. Having appropriated a power of Congress for its own use, the Court now finds itself, at least in the area of foreign commerce, incompetent to wield that power, and passes it off (out of "due regard" for foreign-policy expertise) to the President. *Ante*, at 76. I certainly agree that he is better able to decide than we are which state regulatory interests should currently be subordinated to our national interest in foreign commerce. Under the Constitution, however, neither he nor we were to make that decision, but only Congress.

Petitioner's Import-Export Clause challenge is, for me, a more difficult matter. It has firm basis in a constitutional text that cannot be avoided by showing that the tax on imports and exports is nondiscriminatory.[3] See *Richfield Oil Corp.* v. *State Bd. of Equalization*, 329 U. S. 69, 76 (1946). To come within this constitutional exemption, however, the taxed good must be either an import or an export "at the

---

[3] The Import-Export Clause provides: "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection Laws . . . ." U. S. Const., Art. I, § 10, cl. 2.

time the tax accrued." *Id.*, at 78. I do not think a good can be an export when it will be used in this country, for its designed purpose, before being shipped abroad. In *Richfield*, the Court held that California could not impose its nondiscriminatory sales tax on a shipment of oil that was being exported to New Zealand. The tax accrued upon the delivery of the oil to the purchaser, which was accomplished by pumping the oil into the hold of the vessel that would transport it overseas. The *Richfield* Court noted not only that no portion of the oil was "used or consumed in the United States," *id.*, at 71, but also that "there was nothing equivocal in the transaction which created even a probability that the oil would be diverted to domestic use," *id.*, at 83. With respect to the containers at issue in the present case, by contrast, it was entirely certain that after the time at which the tax accrued (viz., upon delivery of the empty containers to the lessee) they would be used in this country, to be loaded with goods for export. See Brief for Petitioner 7 ("[E]ach [leased] container initially was used to export American goods to foreign ports"). It could not be said, when the tax attached, that "the process of [their] exportation ha[d] started." *Richfield, supra,* at 82. Because I find that the containers at issue were not protected by the Import-Export Clause, I need not consider whether the Tennessee tax would satisfy the test set forth in *Michelin Tire Corp.* v. *Wages,* 423 U. S. 276 (1976).

For the reasons stated, I concur in the Court's conclusion that Tennessee's tax is not unconstitutional under the Foreign Commerce Clause or the Import-Export Clause.

JUSTICE BLACKMUN, dissenting.

It is established "that a treaty should generally be 'construe[d] . . . liberally to give effect to the purpose which animates it' and that '[e]ven where a provision of a treaty fairly admits of two constructions, one restricting, the other enlarging, rights which may be claimed under it, the more

liberal interpretation is to be preferred.'" *United States* v. *Stuart*, 489 U. S. 353, 368 (1989), quoting *Bacardi Corp. of America* v. *Domenech*, 311 U. S. 150, 163 (1940); see also *Nielsen* v. *Johnson*, 279 U. S. 47, 51–52 (1929). This Court recognized in *Japan Line, Ltd.* v. *County of Los Angeles*, 441 U. S. 434 (1979), that the Container Conventions reflect a "national policy to remove impediments to the use of containers as 'instruments of international traffic.'" *Id.*, at 453, quoting 19 U. S. C. § 1322(a); see Customs Convention on Containers, Dec. 2, 1972, [1975] 988 U. N. T. S. 43 (hereinafter 1972 Convention); Customs Convention on Containers, May 18, 1956, [1969] 20 U. S. T. 301, T. I. A. S. No. 6634 (hereinafter 1956 Convention). Tennessee's tax clearly frustrates that policy.

In concluding that Tennessee's tax is not prohibited, the majority studiously ignores the realities of container leasing. All petitioner's containers are dedicated to international commerce, which means that they spend no more than three months at a time in any one jurisdiction. See 1972 Convention, Art. 4; 1956 Convention, Art. 3. Furthermore, transferring containers to new lessees is an integral part of any container-leasing operation. A major advantage of leasing rather than owning a container is that a shipper may return the container to the lessor at or near the shipment destination without having to provide for the return transport of the container. J. Tan, Containers: The Lease-Buy Decision 13 (London, International Cargo Handling Co-ordination Association, 1983). The lessor then transfers the container to another shipper who needs to carry goods from that location or transports the container to another location where it is needed. Leased containers like those of petitioner are constantly crossing national boundaries and are constantly being transferred to new lessees at the ends of their journeys. Whether Tennessee taxes the act of importation or the act of transfer makes little difference with respect to leased containers. Each kind of tax imposes substantial "impediments

to the use of containers as 'instruments of international traffic.'" *Japan Line*, 441 U. S., at 453, quoting 19 U. S. C. § 1322(a), and each, in my view, is prohibited by the Container Conventions.

This is also the view of the other signatory nations to the Conventions. Their consistent practice is persuasive evidence of the Conventions' meaning. See *Air France* v. *Saks*, 470 U. S. 392, 396 (1985), quoting *Choctaw Nation* v. *United States*, 318 U. S. 423, 431–432 (1943) ("'[T]reaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to . . . the practical construction adopted by the parties'"). Neither Tennessee nor the United States as *amicus curiae* can point to any other jurisdiction that directly taxes the lease of containers used in international commerce. Under the European Value Added Tax (VAT) system, as the majority acknowledges, *ante*, at 66, no direct tax is imposed on the value of international container leases.

In an attempt to make international practice fit its reading of the Conventions, the majority mistakenly equates the European VAT on *goods* with Tennessee's tax on *containers*. See *ante*, at 66–67. The European VAT is analogous to an American sales tax but is imposed on the value added to goods at each stage of production or distribution rather than on their sale price. See *Trinova Corp.* v. *Michigan Dept. of Treasury*, 498 U. S. 358, 365–366, n. 3 (1991). The act of transporting goods to their place of sale adds to their value and the cost of transportation is reflected in their price. An American sales tax reaches the cost of transportation as part of the sale price of goods. The European VAT taxes the cost of transportation as part of the value added to goods during their distribution. Tennessee's analogue to the European VAT is its sales tax on goods imported by container, not its direct tax on the proceeds of container leases. Petitioner does not argue that Tennessee must refrain from imposing a sales tax on goods imported by container. It argues, in-

stead, that like every other party to the Conventions, Tennessee may not impose a direct tax on containers themselves.

Even if Tennessee's tax did not violate the Container Conventions, it would violate the Foreign Commerce Clause by preventing the United States from "speaking with one voice" with respect to the taxation of containers used in international commerce. See *Japan Line*, 441 U. S, at 452; *Container Corp. of America* v. *Franchise Tax Bd.*, 463 U. S. 159, 193 (1983). This Court noted in *Japan Line* that the Conventions show "[t]he desirability of uniform treatment of containers used exclusively in foreign commerce." 441 U. S., at 452. Tennessee's tax frustrates that uniformity.

The Court correctly notes that the Solicitor General's decision to file an *amicus* brief defending the tax "'is by no means dispositive.'" *Ante*, at 75, quoting *Container Corp.*, 463 U. S., at 195–196. Indeed, such a submission, consistent with the separation of powers, may not be given any weight beyond its power to persuade. The constitutional power over foreign affairs is shared by Congress and the President, see, *e. g.*, U. S. Const., Art. I, § 8, cl. 11 (Congress shall have the power to declare war); Art. II, § 2, cl. 2 (President shall have the power, by and with the advice and consent of the Senate, to make treaties); and Art. II, § 3 (President shall receive ambassadors), but the power to regulate commerce with foreign nations is textually delegated to Congress alone, Art. I, § 8, cl. 3. "It is well established that *Congress* may authorize States to engage in regulation that the Commerce Clause would otherwise forbid," *Maine* v. *Taylor*, 477 U. S. 131, 138 (1986) (emphasis added), but the President may not authorize such regulation by the filing of an *amicus* brief.

While the majority properly looks to see whether Congress intended to permit a tax like Tennessee's, it mistakenly infers permission for the tax from Congress' supposed failure to prohibit it. *Ante*, at 75–76. "[T]his Court has exempted state statutes from the implied limitations of the [Commerce] Clause only when the congressional direction to do so has

been 'unmistakably clear.'" *Taylor*, 477 U. S., at 139, quoting *South-Central Timber Development, Inc.* v. *Wunnicke*, 467 U. S. 82, 91 (1984). "The need for affirmative approval is heightened by the fact that [Tennessee's tax] has substantial ramifications beyond the Nation's borders." *Id.*, at 92, n. 7. Not only does the majority invert this analysis by finding congressional authorization for the tax in congressional silence, but it finds silence only by imposing its own narrow reading on the Conventions.

The majority invites States that are constantly in need of new revenue to impose new taxes on containers. The result, I fear, will be a patchwork of state taxes that will burden international commerce and frustrate the purposes of the Container Conventions. I respectfully dissent.