631 S.E.2d 559

**U.S. STEEL MINING COMPANY, LLC,** Consolidation Coal Company, Laurel Run Mining Company, McElroy Coal Company, Arch Coal, Inc., Mid–Vol Leasing, Inc., Coastal Coal–West Virginia, LLC, Elk Run Coal Company, Inc., Paynter Branch Mining, Inc., Kingston Resources, Inc. Pioneer Fuel Corporation, Peabody Holding Company, Inc., Petitioners Below, Appellants

v.

The Honorable Virgil **HELTON,** West Virginia State Tax Commissioner, Appellee.

No. 32528.

Supreme Court of Appeals of West Virginia.

Submitted: Sept. 20, 2005.

Decided: Dec. 2, 2005.

Concurring Opinion of Justice Davis Dec. 6, 2005.

Concurring and Dissenting Opinion of Justice Benjamin Jan. 4, 2006.

Concurring Opinion of Justice Albright Jan. 12, 2006.

Herschel H. Rose, III, Esq., Steven R. Broadwater, Esq., Rose Law Office, Charleston, Steven Harlan Becker, Esq., Paul A. Horowitz, Esq., Suzanne Ina Offerman, Esq.,

**2**

Coudert Brothers, New York, NY, for Appellants.

Darrell V. McGraw, Jr., Attorney General, Stephen Stockton, Senior Assistant Attorney General, Charleston, for Appellee.

Perry McDaniel, Esq., Michael J. Meleady, Esq., Office of Legal Services, WV Department of Environmental Protection, Charleston, for Amicus Curiae West Virginia Department of Environmental Protection.

Dennis R. Vaughan, Jr., Esq., Vaughn Law Firm, Charleston, for Amicus Curiae The West Virginia Municipal League, Inc.

Jack C. McClung, Esq., Charleston, for Amicus Curiae West Virginia Association of County Officials, Inc.

Thomas P. Maroney, Esq., Maroney, Weaver, Williams & Pancake, PLLC, Charleston, for Amicus Curiae The West Virginia Labor Federation, AFL-CIO.

Thomas R. Goodwin, Esq., Johnny M. Knisely, II, Esq., Goodwin & Goodwin, LLP, Charleston, for Amicus Curiae The County Commissioners' Association of West Virginia.

Vincent Trivelli, Esq., The Calwell Practice, PLLC, Morgantown, for Amicus Curiae Affiliated Construction Trades Foundation.

STARCHER, J.

In the instant case we uphold a determination by the Circuit Court of Kanawha County that West Virginia's coal production severance taxes are constitutional.

**I.**

*Facts & Background*

**A.**

The appellants are companies that mine and process coal in West Virginia, and then sell that coal. Some of the coal that is mined and processed by the appellants in West Virginia is sold by the appellants to customers for use outside the United States; that is, the coal is exported.

According to the briefs, after the appellants separate coal from the adjoining earth and rocks at a coal mine site in West Virginia, the coal is typically transported to a nearby "raw storage" area, and then is taken to a preparation plant at or near the mine site where the raw coal is cleaned and sized (and may be otherwise processed, by freeze-proofing, etc.). Then the prepared coal that will be exported is typically loaded onto railroad hopper cars, which are hauled by railroad engines to a coastal port, where the coal is transferred from the railroad cars into a ship and transported to a foreign or export destination.

The appellee West Virginia State Tax Commissioner is responsible for collecting certain coal production severance taxes that are imposed on entities like the appellants that produce coal for sale or other commercial use. These taxes, generally referred to as "coal severance taxes," are the subject of the instant case.

The current statutory provisions authorizing these coal severance taxes are found at *W.Va.Code*, 11–12B–3 [2000]; 11–13A–3 [2002]; 11–13A–6 [1997]; 22–3–11 [2005] and 22–3–32 [1994].[1] The language of each severance tax statute is slightly different. Generally speaking, they impose a tax upon persons or entities exercising the privilege of severing, extracting, reducing to possession or producing coal for sale, profit, or commercial use.[2]

---

1. Earlier versions of these statutes apparently provided the basis for some of the particular tax amounts paid by the appellants that are at issue in the instant case; the briefs do not indicate any relevant substantive differences in the pertinent language of those earlier statutory versions. The Tax Commissioner suggests that there is some uncertainty as to whether all of these statutes have been directly challenged by all of the appellants in the instant case; we proceed on the assumption that all of the identified taxes are at issue.

2. In terms of the amount of taxation at issue, it appears that the principal coal severance tax involved in the instant case is set forth in *W.Va. Code*, 11–13A–3 [2002], the relevant portion of which provides:

(a) *Imposition of tax.*—Upon every person exercising the privilege of engaging or continuing within this state in the business of severing, extracting, reducing to possession and producing for sale, profit or commercial use coal, ... there is hereby levied and shall be collected from every person exercising such privilege an annual privilege tax.

Two of the taxes at issue in the instant case, codified at *W.Va.Code*, 11–13A–3 [2002] and 11–13A–6 [1997], are calculated as a percentage of the value of the mined and processed coal. Three of the taxes, codified at *W.Va.Code*, 11–12B–3 [2000], 22–3–11 [2005], and 22–3–32 [1994], are taxes that are calculated as fixed amounts of money assessed per ton mined.

In both cases, pursuant to the practice and regulations of the appellee Tax Commissioner, either the final sales price or the invoiced tonnage of the coal that is sold is used to calculate the taxes; even though this final price or tonnage measurement may in fact be determined only when the coal is delivered to the export carrier ship.

Notably, for purposes of establishing a sales price and value for severance tax calculation, any transportation costs from the preparation plant to the port and thereafter to the customer, if they are absorbed or paid by the seller, are *deducted* from the actual sales price. This adjusted sales price used as the coal's value for severance tax calculation purposes is referred to in industry parlance as the coal's "F.O.B. ['Free on Board'] Mine" price.[3]

## B.

The appellants argue that the imposition of coal severance taxes in connection with the appellants' mining and processing of coal that is shipped to an export customer violates the "Import–Export Clause" of the *United States Constitution*, art. I, sec. 10, cl. 2, which states in pertinent part:

No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection Laws. . . .

The instant case began when the appellants, in accordance with the foregoing statutes, for several years paid severance taxes based on their mining and processing of coal sold for export, and then applied to the appellee Tax Commissioner for refunds. The appellants asserted their claim of unconstitutionality before the Tax Commissioner, who denied the appellants' refund claims. The appellants appealed that decision to the Circuit Court of Kanawha County, which in an order dated May 27, 2004, upheld the Tax Commissioner's decision. The appellants have appealed the circuit court's decision to this Court.

According to the Tax Commissioner, the current total refund liability for the taxes at issue in the instant case (and other related pending cases) could be as high as $360 million dollars, not including interest; additionally, $40 to $50 million dollars annually in legislatively-mandated future severance tax revenue will not be collected if West Virgi-

(b) *Rate and measure of tax.*—The tax imposed in subsection (a) of this section shall be five percent of the gross value of the natural resource produced ... as shown by the gross income derived from the sale or furnishing thereof by the producer. . . .

3. Aside from any constitutional aspects of this F.O.B. Mine method for ascertaining coal's value for purposes of calculating West Virginia's coal severance taxes (for both exports and domestic use), it appears to be the least burdensome feasible method from a compliance standpoint—because it does not require investment in expensive scales at the mine site or preparation plant, nor require redundant paperwork; and it is harmonious and consistent with normal commercial practice in the coal business.

The appellants direct this Court to language in statements by the Tax Commissioner and the circuit court's findings to the effect that West Virginia coal severance taxes "accrue" at the time of the coal's sale. We do not believe this language is dispositive in relation to the legal issue before this Court—the actual constitutionality of the severance taxes in their operation and effect. The controlling statutes show that it is the mining and processing of coal for sale or commercial use that gives rise to a severance tax obligation. The sale of the coal is merely the event that establishes the basis for calculating the tonnage or value of the coal for purposes of ascertaining the amount of tax due. It is the privilege and occasion of producing coal for sale or commercial use that is taxed. *See* discussion of severance taxes at note 5 *infra*. *De novo* review on appeal means that the result and not the language used in or reasoning of the lower tribunal's decision, is at issue. A reviewing court may affirm a lower tribunal's decision on any grounds. *See GTE South, Inc. v. Morrison*, 199 F.3d 733, 742 (4th Cir.1999) ("if the administrative order reaches the correct result and can be sustained as a matter of law, we may affirm on the legal ground even though the agency relied on a different rationale").

nia's coal severance taxes on mining and processing coal for export are held to be constitutionally invalid.

## II.

### Standard of Review

■ This case presents questions of statutory interpretation and application, and a determination of the constitutionality of several statutes, all of which are matters that this Court reviews *de novo*. Additionally, as we stated in Syllabus Point 1 of *State ex rel. Haden v. Calco Awning & Window Corp.*, 153 W.Va. 524, 170 S.E.2d 362 (1969):

"When the constitutionality of a statute is questioned every reasonable construction of the statute must be resorted to by a court in order to sustain constitutionality, and any doubt must be resolved in favor of the constitutionality of the legislative enactment." Point 3, Syllabus, *Willis v. O'Brien*, 151 W.Va. 628 (153 S.E.2d 178).

## III.

### Discussion

■ In support of their position that the imposition of coal severance taxes in connection with the appellants' mining and processing of coal that is shipped to an export customer violates the "Import–Export Clause" of the *United States Constitution*, art. I, sec. 10, cl. 2, the appellants principally rely on the case of *Richfield Oil Corp. v. State Board of Equalization*, 329 U.S. 69, 67 S.Ct. 156, 91 L.Ed. 80 (1946).

In *Richfield Oil*, the State of California assessed a retail sales tax on a sale of oil by a California refinery to the government of New Zealand. The Supreme Court found that the California sales tax was imposed when the oil was delivered into the hold of the foreign purchaser's ship and into the control of a foreign purchaser; that the sales tax was therefore imposed on the oil while it was in the export transit process; and the tax was therefore an impost or duty that violated the Import–Export Clause.[4]

In 1976 the focus of Import–Export Clause analysis took a sharp turn in *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 96 S.Ct. 535, 46 L.Ed.2d 495 (1976).

Finding the terms "impost" and "duty" to be inherently ambiguous, and recognizing a longstanding difficulty in the case law in determining in a principled fashion when goods were or were not in a stream of export or import at the time of taxation so as to invoke the blanket tax exemption set by the Import–Export Clause, the Court "created a regime in which those terms [impost and duty] are conclusions to be drawn from an examination into whether a particular assessment 'was the type of exaction that was regarded as objectionable by the Framers of the Constitution.'" *U.S. v. I.B.M. Corp.*, 517 U.S. 843, 858 116 S.Ct. 1793, 1802, 135 L.Ed.2d 124, 138 (1996) (internal citations omitted).

The Court in *Michelin* adopted an analysis based on the concerns that prompted the founding fathers to write the Import–Export Clause in the first place:

The Framers of the Constitution thus sought to alleviate three main concerns by committing sole power to lay imposts and duties on imports in the Federal Government, with no concurrent state power: the Federal Government must speak with one voice when regulating commercial relations with foreign governments, and tariffs, which might affect foreign relations, could not be implemented by the States consistently with that exclusive power; import revenues were to be the major source of revenue of the Federal Government and should not be diverted to the State; and

---

4. To support its conclusion, the *Richfield Oil* Court looked to language in two earlier cases, *Coe v. Errol*, 116 U.S. 517, 527, 6 S.Ct. 475, 478, 29 L.Ed. 715, 718–19 [1886] (goods became exports to which the Import–Export Clause automatically applied when they had "been started upon such [export] transportation in a continuous route or journey."); and *A.G. Spalding & Bros. v. Edwards*, 262 U.S. 66, 69, 43 S.Ct. 485, 486, 67 L.Ed. 865, 867 (1923) (goods became exempt exports "after they had been loaded".) *Richfield Oil*, 329 U.S. at 79–81, 67 S.Ct. at 161–63, 91 L.Ed. at 91–92. As our discussion *infra* indicates, the coal severance taxes at issue in the instant case are not imposed on goods after they have been loaded, nor after they have clearly been started on their journey.

harmony among the States might be disturbed unless seaboard States, with their crucial ports of entry, were prohibited from levying taxes on citizens of other States by taxing goods merely flowing through their ports to the other States not situated as favorably geographically.

423 U.S. at 285–86, 96 S.Ct. at 540–41, 46 L.Ed.2d at 503 (footnotes omitted).

The new policy-based *Michelin* approach was adopted and slightly modified to fit exports in *Washington Dept. of Revenue v. Assoc. of Washington Stevedoring Cos.*, 435 U.S. 734, 758, 98 S.Ct. 1388, 1403, 55 L.Ed.2d 682, 702 (1978) ("[T]he Michelin approach should apply to taxation involving exports as well as imports.").

The first element of the *Michelin* analysis as applied to exports is whether the tax impinges on the federal government's ability to speak with one voice when regulating commercial relations with foreign governments. In *Container Corp. of America v. Franchise Tax Board*, 463 U.S. 159, 194, 103 S.Ct. 2933, 2955, 77 L.Ed.2d 545, 571–72 (1983), the Court stated:

> In conducting this inquiry, however, we must keep in mind that if a state tax merely has foreign resonances, but does not implicate foreign affairs, we cannot infer, "[a]bsent some explicit directive from Congress, ... that treatment of foreign income at the federal level mandates identical treatment by the States." Thus, a state tax at variance with federal policy will violate the "one voice" standard if it *either* implicates foreign policy issues which must be left to the Federal Government *or* violates a clear federal directive. The second of these considerations is, of course, essentially a species of pre-emption analysis.

*Id.* (citations omitted, italics in original).

The appellants argue that West Virginia's coal production severance taxes adversely impact the level of U.S. coal exports, by increasing the price of that coal, and therefore reducing West Virginia coals' competitiveness in the world market.[5]

But the same could be said with respect to any clearly legitimate state tax that is imposed in any fashion—like a workers' compensation tax on the pay of factory workers in a plant that makes exports—that has the effect of increasing the price of a good that was subsequently exported.

This mere price increase is not the kind of adverse effect on foreign affairs—like causing retaliation by foreign governments—that we think is required under the *Michelin/Washington Stevedoring* approach. The appellants do not identify any such effect. Nor do the appellants identify any substantial clear federal directive (*Container Corp., supra*) that West Virginia's severance taxes violate.

The second element of the *Michelin* analysis, an effect on federal import revenues, is largely irrelevant in the case of exports; and in the instant case, the appellants do not demonstrate any such effect from West Virginia's severance tax on coal production.

The third element of the *Michelin/Washington Stevedoring* analysis, ensuring a fair system of harmony in commerce among the states, coincides with the Commerce Clause test that the tax fall upon a taxpayer with a nexus to the state, be properly apportioned, not discriminate, and reasonably relate to the services provided by the state. *Washington Stevedoring*, 435 U.S. at 754–55, 98 S.Ct. at 1401–1402, 55 L.Ed.2d at 700. This Commerce Clause test is presumptively met in the instant case because the Supreme Court has already held that a coal severance tax like those at issue in this case survives Commerce Clause analysis. *Commonwealth Edison Company v. Montana*, 453 U.S. 609, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981) (discussed further *infra*).[6]

We have fully reviewed the arguments of the appellants on the question of whether the

---

5. The appellant's asserted "decreased competitiveness" of West Virginia's export coal is called into question by recent coal export figures cited by the Tax Commissioner.

6. The appellants also argue that there is a decrease in coal shipments from West Virginia through other states, especially port states, as a result of the asserted decreased competitiveness of West Virginia export coal caused by West Virginia's coal severance taxes. The possibility that port facilities in Maryland and Virginia might suffer from decreased exports due to evenhanded and non-discriminatory West Virginia coal severance taxes does not unconstitutionally

severance taxes in the instant case are of a type that was regarded as objectionable by the Framers of the Constitution under the foregoing *Michelin* analysis. We conclude that they are not.

In apparent recognition that their *Michelin*-based arguments do not have compelling force, the appellants also argue that the *Michelin* policy-based analysis has not fully supplanted the more mechanistic "in export transit" approach of earlier cases like *Richfield Oil.*

The appellants point to language in *U.S. v. I.B.M., supra,* 517 U.S. at 862, 116 S.Ct. at 1804, 135 L.Ed.2d at 140: "The Court has never upheld a state tax assessed directly on goods in import or export transit." [7]

The appellants then point to the fact that West Virginia's percentage-of-value coal severance taxes are calculated based on a valuation of the coal that includes the cost of loading the coal into rail cars at the preparation plant under the "F.O.B. Mine" method.

The loading process, argue the appellants, is a part of the coal's being "in export transit;" and including the coal loading process within the severance taxes' ambit means that the tax is being imposed on goods that are in export transit.

This feature of the West Virginia coal severance tax system, according to the appellants, therefore makes the entire coal severance tax unconstitutional when applied to coal that is to be exported—including the much larger portion of the tax that is calculated based on the coal's value just before the beginning of the loading process and after the coal has been mined and prepared.

This Court has recognized that coal severance taxes may include taxation of the value added by the loading of the coal into rail cars by the coal's producer—that is, that the initial loading of coal at the preparation plant for shipment is, at least when combined with mining and processing, one of the "taxable events" under the statutes. Syllabus Point 4, *Kanawha Eagle Coal, LLC v. Tax Comm'r,* 216 W.Va. 616, 609 S.E.2d 877 (2004).[8]

However, in *Kanawha Eagle* this Court rejected the Tax Commissioner's argument that further loading of coal that occurs away from the initial point of mining and processing could be used in calculating severance taxation.

*Kanawha Eagle* thus stands for the proposition that the initial process of loading of coal by the mining and processing company at a coal preparation facility is properly

---

create disharmony between neighboring states, any more than do even-handed and nondiscriminatory taxes collected by Maryland and Virginia—like gasoline taxes—that increase the cost of transportation through those states. The appellants simply have not shown that West Virginia's severance taxes carry with them unusual circumstances that disturb West Virginia's neighbors. Appellants' argument suggests the absurd result that states with ports could make a constitutional demand that states that export goods through those ports remove otherwise non-discriminatory local taxes, based on local costs of production, in order to maximize the volume of goods shipped through the ports. As much as they undoubtedly love their neighbors, West Virginia taxpayers are not constitutionally responsible for maximizing shipping jobs in Virginia and Maryland, if to do so means gutting their own public fisc. Appellants' argument fundamentally misreads the nature of our federal system, where the interests of diversity and experimentation are served by states retaining a significant flexibility in taxation—a flexibility that of necessity will have economic impacts on other states—without in all cases offending the national *Constitution.*

7. The *I.B.M.* Court also quoted language from *Michelin* suggesting that the Import–Export Clause would apply to "nondiscriminatory property taxes on goods which are merely in transit when the tax is assessed." 517 U.S. at 862, 116 S.Ct. at 1804, 135 L.Ed.2d at 140 (citations omitted). The taxes in the instant case are nondiscriminatory, but as the discussion *infra* shows, they are not property taxes nor are they imposed on goods that are "merely in export transit."

8.

The initial loading of fully processed clean coal at the preparation plant for shipment is one of the specified activities viewed as a taxable event associated with the privilege of mining in this state. However, any reloading of coal that transpires after the initial loading at the preparation plant is part of the delivery process, rather than the mining process, and accordingly falls outside of the statutorily delineated activities that qualify as part of the taxable treatment processes performed upon coal set forth in *West Virginia Code* § 11–13A–4(a)(1) (1987) (Repl.Vol. 2003).

Syllabus Point 4, *Kanawha Eagle, supra.*

viewed as a part of the coal production/mining and processing process; and once the coal is initially loaded, and thereafter when the coal has begun its movement or transit from the preparation plant toward a final destination, the applicable statutes do not allow the severance tax to be imposed on activity, value, or cost added during that movement or transit.

The holding of *Kanawha Eagle* is therefore consistent with the view that coal that "is being" initially loaded is at the tail end of the "coal production" process, and is properly amenable to valuation for severance taxation purposes; and that only once coal "has been" loaded can it enter into a "transit" process that is statutorily excluded from inclusion in severance taxation.

For this reason, the *Kanawha Eagle* decision is not supportive of the appellants' argument that coal being initially loaded at a preparation plant is clearly (much less "merely") "in export transit." *See* note 4 *supra.*[9]

A helpful perspective on the severance taxes at issue in this case can be gained by examining the U.S. Supreme Court's opinion in *Commonwealth Edison Company v. Mon-*

*tana*, 453 U.S. 609, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981).

In *Commonwealth Edison*, a Commerce Clause/Supremacy Clause (*United States Constitution*, Art. I, Sec. 8, cl. 3 and Art. VI, cl. 2) challenge was brought to Montana's coal severance tax. The Montana coal severance tax at issue in *Commonwealth Edison* was very similar to the coal severance taxes at issue in the instant case. Montana's tax was calculated, at varying rates, on the value of the coal after it has been "extracted and prepared for shipment *f.o.b. mine,*" *Commonwealth Edison*, note 1, 453 U.S. at 613, 101 S.Ct. at 2951, 69 L.Ed.2d at 891. (Emphasis added.)

The United States Supreme Court held in *Commonwealth Edison* that Montana's coal severance tax was "like a real property tax," 453 U.S. at 624, 101 S.Ct. at 2957, 69 L.Ed.2d at 899; and was tied to the diminution of future sources of economic activity, the depletion of the resource base of the state, and the necessity of supporting the social infrastructure that is necessary to allow coal severance to occur. *Id.*[10]

One of the conclusions of the Montana Supreme Court in *Commonwealth Edison v.*

9. Additionally, it is noteworthy that at oral argument before the Circuit Court of Kanawha County, the appellants' counsel stated: *"Once the coal is loaded* onto the rail cars it enters the zone [of] immunity of [the] Import–Export Clause ...." Trial Court Hearing Transcript, November 17, 2003, p. 11 (emphasis added).

10. Other states have severance taxes similar to West Virginia's. In upholding the South Dakota severance tax, the South Dakota court in *Homestake Mining Company v. Johnson*, 374 N.W.2d 357 (S.D.1985) stated:

The Act containing the statutes here in question, Chapter 95 of the 1981 South Dakota Session Laws, is entitled: "An Act to enact a mineral severance tax on precious metals." In SDCL 10–39–43, it states: "For the privilege of severing precious metals in this state, there is imposed a severance tax ...." Although a legislative tax label does not, ipso facto, determine the nature of a tax, this language evidences the legislative intent to *tax mineral severance* and *not mineral sales.* Merely because the measure of the tax is gross receipts, does not mean the nature of the tax is a sales tax.... We find unpersuasive Homestake's assertion that it is a sales tax because a sale triggers the imposition of the tax. The sale cannot occur until there has been a severance

from the earth in the first instance. Thereafter, a sale merely determines the metal's value and thus provides a measure for the tax and a time for collection ....The operating incidence of the tax is the severance of precious metals in South Dakota. The State of South Dakota is not taxing the sales, profit or income which Homestake makes from selling its gold. In contradistinction, the state is taxing the extraction of natural resources. Our State Legislature, the organ of the people, is concerned with the depletion of natural resources; also, it is apparently concerned with the loss of a future source of revenue and wealth.
*Homestake*, 374 N.W.2d at 362–63 (emphasis in original).

As a general matter, severance taxes are related not only to the activity of coal production, but to the concomitant depletion of natural resources which leads to a decrease in property tax valuation and business activity. As coal reserves are depleted through mining, the value of those coal properties declines for future property tax purposes. *See Commonwealth Edison Co. v. Montana*, 453 U.S. at 624, 101 S.Ct. at 2957, 69 L.Ed.2d at 898 (1981) ("mining of the coal depletes the resource base and wealth of the State, thereby diminishing a future source of taxes and economic activity") (footnote and citation omitted). The Supreme Court of Montana, address-

*State*, 189 Mont. 191, 198, 615 P.2d 847 (1980)—the decision under review by the U.S. Supreme Court in its *Commonwealth Edison* decision, *supra*—was that the Montana coal severance tax was imposed *before* the coal had actually entered interstate commerce, and therefore, the Montana tax did not offend the Commerce Clause. 189 Mont. at 196–97, 615 P.2d at 851.

In response to this conclusion by the Montana court, the United States Supreme Court held that "a state severance tax is not immunized from Commerce Clause scrutiny by a claim that the tax is imposed on the goods prior to their entry into the stream of interstate commerce." *Commonwealth Edison*, 453 U.S. at 617, 101 S.Ct. at 2953, 69 L.Ed.2d at 894. The Supreme Court in *Commonwealth Edison* thereby implicitly accepted as correct the Montana court's conclusion that the Montana coal severance tax was imposed on coal prior to its entry into the stream of

ing a challenge to that state's severance-tax-funded trust and quoting from its previous opinion in *Commonwealth Edison v. State*, 189 Mont. 191, 196, 615 P.2d 847, 849 (1980), stated:

> Montana's experience had shown that its mineral wealth could be exhausted and exported with little left in Montana to make up the loss of its irreplaceable resources. Montana has been painfully educated about the extreme economic jolts that follow when the mine runs out, the oil depletes, or the timber saws come still. We have a good many examples that teach us what happens to our hills when the riches of our Treasure State are spent.

*Montanans for the Coal Trust v. State*, 298 Mont. 69, 996 P.2d 856, 858 (2000).

The Maine legislature, when enacting that state's mining excise tax, explicitly found: "Mineral resources have historically been a primary source of economic wealth, are valuable and, once removed, are forever lost as an economic asset to the State." Me.Rev.Stat. 36–371–2852(2).

The *State Taxation* treatise by Jerome and Walter Hellerstein states:

> Furthermore, the states can make out a persuasive case for levying higher taxes on coal, oil, and other natural resources than on other subjects, on the ground that the exploitation of natural resources entails costs and losses to the states and benefits to the industry that far exceed those involved in typical industrial operations. Former Governor Arthur A. Link of North Dakota outlined some of the extraordinary costs to the state of coal mining in defending his state's coal severance tax—strip mining the land, removing fertile topsoil, consumption of vast amounts of scarce water, and interference with water aquifers. Such evidence helps to justify selective excises on natural resource industries and insulate them from challenges on the ground that they are discriminatory or not even-handed by comparison with the state's taxes on non-natural resource industries.
>
> Finally, in defending high, selective severance taxes on the extractive industries, the states have an additional argument: the extractive industries, unlike most other industries, deplete the natural resources of the state. Manufacturers create the goods they sell, farm-

ers grow their crops, and even the timber industry (at least the large companies engaged in timbering) regrows the forests it cuts down. But mining companies and oil producers extract wealth from the earth that is irreplaceable. Those facts offer a strong justification for high, selective severance taxes on the natural resources. Governor Link may thus have been on sound constitutional ground in asserting that a state whose coal is exploited for the benefit of the rest of the nation is entitled to "just compensation for losing forever a one time harvest."

J. Hellerstein and W. Hellerstein, STATE TAXATION: THIRD EDITION ¶ 4.17(2)(d) (2004) (footnotes omitted).

Thus, severance taxes are intended, among other things, to compensate the state for the permanent depletion of its natural bounty, and are entitled to special consideration. Severance taxes are an attempt to make extractive industries pay their fair share for the natural resources and services the state supplies, and that *quid pro quo* concept has been validated by the United States Supreme Court in the context of the Import–Export Clause.

> The Import–Export Clause clearly prohibits state taxation based on the foreign origin [or destination] of the imported [or exported] goods, but it cannot be read to accord imported [or exported] goods preferential treatment that permits escape from uniform taxes imposed without regard to foreign origin [or destination] for services which the State supplies.

*Michelin Tire Corp. v. Wages*, 423 U.S. at 287, 96 S.Ct. at 541, 46 L.Ed.2d at 504 (1976).

> To be sure, allowance of nondiscriminatory ad valorem property taxation may increase the cost of goods purchased by "inland" consumers. But as already noted, such taxation is the quid pro quo for benefits actually conferred by the taxing State.

423 U.S. at 288–289, 96 S.Ct. at 542, 46 L.Ed.2d at 505.

West Virginia does not distinguish between coal that is exported and coal used domestically when imposing the taxes at issue in this case, and West Virginia's severance taxes are levied as a *quid pro quo* for the benefits the State provides and the permanent loss the State suffers when its natural resources are extracted.

interstate commerce.[11]

Although *Commonwealth Edison* was a Commerce Clause case and not a case involving the Import–Export Clause, the Supreme Court's acceptance of the Montana court's conclusion—that the events providing the basis for Montana's imposition of a coal severance tax occurred *prior* to the coal's entry into interstate commerce—supports the analogous conclusion that severance taxes like West Virginia's are based upon and imposed upon activity that occurs prior to the mined and processed coal's entry into export transit.

The appellants cite to a decision of the Fifth Circuit, *Louisiana Land & Exploration Company v. Pilot Petroleum Corporation*, 900 F.2d 816 (5th Cir.1990) in support of their contention that the Import–Export Clause prohibits the imposition of the coal severance taxes in the instant case.

In *Louisiana Land,* the State of Louisiana imposed a sales tax on jet fuel sold by a Louisiana company and pumped by that company into a tanker for shipment to Nova Scotia. The *Louisiana Land* court found that the tax was levied on the oil while the oil was undisputedly in export transit; and that the *Michelin* policies were offended when a "port state" imposed unfair taxes on goods coming from states having no ports. 900 F.2d at 820–21.

For several reasons, we find that the *Louisiana Land* case is not persuasive on the issues in the instant case. First, the coal severance taxes in the instant case are neither sales taxes nor excise taxes, and they are not imposed on goods that are undisputedly in export transit. Additionally, the *Michelin*-based policy relied upon by the

*Louisiana Land* court—of preventing unfair "port-state" taxation of goods that are clearly in export transit—is not implicated by West Virginia's severance tax, which is imposed in the goods' state of origin long before they reach any port, and are applied even-handedly on all commercial coal production—for export to foreign countries, export to other states, or to be used in-state.[12]

IV.

*Conclusion*

To review the foregoing points:

(1) West Virginia's coal severance taxes are substantially similar to coal severance taxes that have been found to be constitutional by the United States Supreme Court;

(2) West Virginia's coal severance taxes do not discriminate against coal exports;

(3) West Virginia's coal severance taxes do not offend the policies that the Supreme Court has said underlie the Import–Export Clause;

(4) West Virginia's coal severance taxes provide crucial revenue to the State that fairly reflects the costs to the State associated with coal production;

(5) No court in America has held that coal severance taxes like West Virginia's offend the Import–Export Clause;

(6) The specific tax-related activity that the appellants contend most clearly implicates the Import–Export Clause—the initial loading of coal at coal preparation facilities into rail cars—is not clearly a part of the export transit process. Moreover, this initial loading process comprises a *de minimis* portion of the value of the coal that is included in the calculation of some of West Virginia's

**11.** The U.S. Supreme Court found that this conclusion by the Montana court did not insulate the severance tax from Commerce Clause review; and upon that review, the Court upheld the severance tax.

**12.** Nor is the appellants' cited case of *Virginia Indonesia Company v. Harris County Appraisal District,* 910 S.W.2d 905, 39 Tex.Sup.Ct.J. 37 (1995) persuasive. In that case, the court found that the goods in question were merely in export transit through Texas, and therefore were exempt under the Import–Export Clause from a local property tax. This situation is far different from

the facts of the instant case. As the Texas Supreme Court stated: "It is one thing to tax property that has come to rest within the state; it is quite another to tax property that is merely passing through on its way to its final foreign destination." 910 S.W.2d at 914–915. The coal being mined and processed by the appellants has been "at rest" in West Virginia for many millions of years. The coal being mined and processed by the appellants is hardly "merely passing through" West Virginia—unless we are dealing with a geologic and not human time frame.

severance taxes. Nor is the severed coal "merely in transit" through West Virginia; and, lastly,

(7) The standard of review applicable to the coal severance taxes in question in the instant case requires us to affirm the taxes as constitutional unless it appears beyond doubt that they offend the *United States Constitution.*

Numerous *amici,* including State, county, and municipal bodies, have filed briefs documenting the beneficial uses of the tax revenue at issue in the instant case. We need not detail their undisputed submissions that establish the great magnitude of importance attendant to our resolution of the issues in the instant case. Suffice it to say that the coal production severance taxes at issue in this case fund critical environmental reclamation and public welfare programs. Many of these programs are directly related to the effects of coal mining.

To uphold the refunds requested by the appellants and the resulting prospective loss of coal production severance tax revenue would be—again undisputedly—a body blow to the welfare and public fisc of West Virginia and her citizens.

If the severance taxes in question are clearly unconstitutional, they must of course be invalidated, without regard to the fiscal effect of such a ruling.

But for this Court to overrule the studied decision of the West Virginia Legislature to impose certain taxes—to deny the people of the State the benefit of laws enacted by their representatives and of crucial revenue—a strong and clear showing of the taxes' invalidity would be necessary.

No such showing has been made.

In consideration of the foregoing points and applying the proper standard of review, we conclude that the coal severance taxes in question pass constitutional muster.

We hold, therefore, that the coal production severance taxes contained in current and earlier versions of *W.Va.Code,* 11–12B–3 [2000]; 11–13A–3 [2002]; 11–13A–6 [1997]; 22–3–11 [2005]; and 22–3–32 [1994] do not offend the Import–Export Clause of the *United States Constitution,* art. I, sec. 10, cl. 2.[13]

The judgment of the Circuit Court of Kanawha County is affirmed.

Affirmed.

MAYNARD, Justice, dissenting.

It is crystal clear to me that at least two of the taxes at issue in this case, the basic severance tax in W.Va.Code § 11–13A–3 and the additional severance tax on coal in W.Va. Code § 11–13A–6(a), are unconstitutional under the federal Import–Export Clause as interpreted by the Supreme Court in *Richfield Oil Corp. v. State Board of Equalization,* 329 U.S. 69, 67 S.Ct. 156, 91 L.Ed. 80 (1946).

The issue in *Richfield Oil* was the constitutionality of a California tax imposed upon an oil refinery for the sale of oil to the New Zealand government. The delivery of the oil to the purchaser by pumping the oil into the foreign purchaser's ship resulted in the passage of title and the completion of the sale which was the taxable incident. In determining that the tax was an improper impost upon an export within the meaning of the Import–Export Clause, the Supreme Court reasoned:

Delivery was made into the hold of the vessel from the vendor's tanks located at the dock. That delivery marked the com-

**13.** Additionally, if any of the coal production severance taxes set forth in current and earlier versions of *W.Va.Code,* 11–12B–3 [2000]; 11–13A–3 [2002]; 11–13A–6 [1997]; 22–3–1 [2005]; and 22–3–32 [1994] is determined by the United States Supreme Court or other court of competent and final jurisdiction to offend the Import–Export Clause of the *United States Constitution,* art. I, sec. 10, cl. 2., because the tax is based to any degree on coal loading or other activities that are determined to constitute a portion of the "export transit" process, the least intrusive and

proper remedy under West Virginia law would be to sever and find invalid and refundable only that portion of the tax that is fairly attributable to the export transit process—and not to invalidate the entire severance tax due. *Compare W.Va. Code,* 2–2–10(cc) [1989] (statutory provisions that are unconstitutional may be severed); *See In re Dostert,* 174 W.Va. 258, 269, 324 S.E.2d 402, 412 (1984) ("These statutory provisions are codifications of basic constitutional statutory construction severability law.").

mencement of the movement of the oil abroad. It is true, as the Supreme Court of California observed, that at the time of the delivery the vessel was in California waters and was not bound for its destination until it started to move from the port. But when the oil was pumped into the hold of the vessel, it passed into the control of a foreign purchaser and there was nothing equivocal in the transaction which created even a probability that the oil would be diverted to domestic use ....

It seems clear under the decisions which we have reviewed involving Article I, Section 9, Clause 5 of the Constitution that the commencement of the export would occur no later than the delivery of the oil into the vessel.

*Richfield,* 329 U.S. at 82–83, 67 S.Ct. at 163–164.

This straightforward analysis is clearly applicable to the instant case. The facts herein show that the processed coal moves into export transit as it is loaded onto the train through the flood load facility. From that point, the train travels to the dock where the coal from each car is dumped onto a conveyor belt which loads the coal directly into the vessel for export overseas. Significantly, once the coal is loaded onto the train, it cannot be diverted from its overseas destination. Further, there is no dispute that sale of the coal occurs no earlier than when the coal is loaded onto the railcars, and that the taxes at issue accrue at the time of sale. Thus, I believe that any fair application of the law as articulated in *Richfield Oil* to the undisputed facts mandates the conclusion that the so-called severance taxes at issue are actually taxes imposed upon an export which violate the Import–Export Clause.

The majority opinion chooses to ignore *Richfield Oil* by making the dubious observation that "the focus of Import–Export Clause analysis took a sharp turn" in *Michelin Tire Corp. v. Wages,* 423 U.S. 276, 96 S.Ct. 535, 46 L.Ed.2d 495 (1976) and *Washington Dept. of Revenue v. Assoc. of Washington Stevedoring Cos.,* 435 U.S. 734, 98 S.Ct. 1388, 55 L.Ed.2d 682 (1978). I believe the majority opinion's wholesale rejection of *Richfield Oil* in favor of the *Michelin Tire/Washington*

*Stevedoring* line of cases is improper for several reasons.

First, it is undisputed that the Supreme Court has never overruled *Richfield Oil.* Therefore, this Court should not feel free to completely reject the law set forth by the Supreme Court in that case. Second, the Supreme Court has indicated that it never intended the *Michelin/Washington Stevedoring* line of cases to supplant *Richfield.* Rather, the Court plainly has distinguished *Richfield* from *Michelin/Stevedoring.* For example, in *United States v. IBM, Corp.,* 517 U.S. 843, 116 S.Ct. 1793, 135 L.Ed.2d 124 (1996), the Court explained:

> Our holdings in *Michelin* and *Washington Stevedoring* do not ... interpret the Import–Export Clause to permit assessment of nondiscriminatory taxes on imports and exports in transit. *Michelin* involved a tax on goods, but the goods were no longer in transit. The tax in *Washington Stevedoring* burdened imports and exports while they were still in transit, but it did not fall directly on the goods themselves ....
>
> The Court has never upheld a state tax assessed directly on goods in import or export transit ....
>
> ... Thus, contrary to the Government's contention, this Court's Import–Export Clause cases have not upheld the validity of generally applicable, nondiscriminatory taxes that fall on imports or exports in transit. We think those cases leave us free to follow the express textual command of the Export Clause to prohibit the application of any tax "laid on Articles exported from any State."

*IBM,* 517 U.S. at 861–862, 116 S.Ct. at 1803–1804 (citations omitted). Under the distinction made by the Supreme Court, because the facts in this case involve a tax on goods in transit, *Richfield Oil,* not *Michelin/Washington Stevedoring,* applies. Finally, because *Richfield Oil* remains good law and it directly controls this case, it should be followed by this Court. The Supreme Court has explained that "If a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [the lower court] should follow the case which directly con-

trols, leaving to this Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 484, 109 S.Ct. 1917, 1921–22, 104 L.Ed.2d 526 (1989).

In the instant case, the majority opinion should have relied upon the law set forth in *Richfield Oil.* Application of that law to the present facts indicates that the severance taxes at issue, which are imposed on the coal after it is moved into export transit, is a tax upon an export within the meaning of the Import–Export clause and is therefore unconstitutional. Accordingly, I dissent.[1]

DAVIS, J., concurring.

(Filed Dec. 6, 2005)

In this proceeding, several coal producing taxpayers challenged six state tax statutes [1] as violating the Import–Export Clause of the federal constitution.[2] The majority opinion, relying upon sound legal analysis, determined that none of the statutes violated the Import–Export Clause. I fully concur in the majority decision and its analysis. I have chosen to write separately to emphasize the correctness of the legal analysis enunciated in the majority decision.

## DISCUSSION

The United States Supreme Court has long held that the Import–Export Clause " 'was meant to confer immunity from local taxation upon property being exported, not to relieve property eventually to be exported from its share of the cost of local services.' " *Kosydar v. National Cash Register Co.,* 417 U.S. 62, 70, 94 S.Ct. 2108, 2113, 40 L.Ed.2d 660 (1974) (quoting *Joy Oil Co. v. State Tax*

*Comm'n,* 337 U.S. 286, 288, 69 S.Ct. 1075, 1077, 93 L.Ed. 1366 (1949)). Consequently, the Import–Export Clause does not prohibit states from imposing "generally applicable, nondiscriminatory taxes even if those taxes fall on . . . exports." *United States v. I.B.M. Corp.,* 517 U.S. 843, 852, 116 S.Ct. 1793, 1799, 135 L.Ed.2d 124 (1996) (citing *Department of Revenue of Washington v. Association of Washington Stevedoring Cos.,* 435 U.S. 734, 98 S.Ct. 1388, 55 L.Ed.2d 682 (1978); *Michelin Tire Corp. v. W.L. Wages,* 423 U.S. 276, 96 S.Ct. 535, 46 L.Ed.2d 495 (1976)). For this reason, the Supreme Court has expressly "rejected the assertion that the Import–Export Clause absolutely prohibits all taxation of . . . exports." *I.B.M. Corp.,* 517 U.S. at 857, 116 S.Ct. at 1802 (citation omitted). With these general considerations in mind, I address three issues: (a) the nature and purpose of the severance tax statutes; (b) assessment of severance taxes based upon sale price; and (c) taxing the loading of coal.

### A. The Nature and Purpose of the Severance Tax Statutes

The tax statutes at issue in this case are nondiscriminatory. The statutes apply to the production of coal regardless of whether the coal is to be sold within the United States or abroad. That is, the statutes do not set out special taxing provisions for exported coal or coal used domestically. The taxes apply without regard to the ultimate destination of the coal. Further, the taxes do not attach to coal that is in transit or export within the meaning of the Import–Export Clause.[3]

For the sake of presentation here, the taxpayers have challenged five severance tax

---

1. Because of what I consider to be the majority opinion's insufficient analysis of the constitutionality of the other taxes challenged in this case, I decline to concur with its conclusion that those taxes are constitutional.

1. Two of the statutes addressed in the majority opinion, W. Va.Code § 11–13A–4 and W. Va. Code § 22–3–11, were not expressly listed in the "KIND OF PROCEEDING AND NATURE OF THE RULING BELOW" section in the taxpayers' brief as having been contested in the lower courts. However, W. Va.Code § 11–13A–4 was discussed in section 3 of the "DISCUSSION OF LAW" part of the taxpayers' brief. With refer-

ence to W. Va.Code § 22–3–11, the State's brief indicated that "Taxpayers' counsel, in his opening remarks to the administrative tribunal, seemed to say that Taxpayers were contesting [W. Va.Code § 22–3–11]."

2. The majority opinion correctly noted that the record was unclear as to whether all of the taxpayers were challenging each of the statutes in question.

3. This issue is squarely addressed in Section C, *infra.*

statutes[4] as violating the Import–Export Clause: a severance privilege tax, a severance tax for local governments, a minimum severance tax, a mining and reclamation operations fund tax, and a special reclamation tax.

First, the "severance privilege tax" is set forth in W. Va.Code § 11–13A–3. This statute imposes a tax "[u]pon every person exercising the privilege of engaging or continuing within this state in the business of severing, extracting, reducing to possession and producing for sale, profit or commercial use coal, limestone or sandstone[.]" *Id.* With some exceptions, this tax is imposed at a rate of 5% of the gross income derived from the sale of coal.

Second, the "severance tax for local governments" is set out under W. Va.Code § 11–13A–6. This statute imposes a tax "[u]pon every person exercising the privilege of engaging or continuing within this state in the business of severing coal, or preparing coal (or both severing and preparing coal), for sale, profit or commercial use[.]" *Id.* This tax is imposed at a rate of 0.35% of the sales proceeds of coal. All the taxes collected under this statute are turned over to local governments.[5]

Third, the "minimum severance tax" is set under W. Va.Code § 11–12B–3. This statute imposes a tax on "every person exercising the privilege of engaging within this state in severing, extracting, reducing to possession or producing coal for sale, profit or commercial use[.]"[6] *Id.* This tax is imposed at a rate of $0.75 per ton of coal mined. .

Fourth, the "mining and reclamation operations fund tax" is imposed under W. Va. Code § 22–3–32. This statute imposes a tax "[u]pon every person in this state engaging in the privilege of severing, extracting, reducing to possession or producing coal for sale, profit or commercial use[.]" *Id.* This tax is imposed at the rate of $0.02 per ton of coal mined. Taxes collected under this statute are placed in a mining and reclamation operations fund. The statute states that the moneys in such fund must be used "solely for the purposes of carrying out those statutory duties relating to the enforcement of environmental regulatory programs for the coal industry as imposed by this chapter and the federal Surface Mining Control and Reclamation Act of 1977[.]" *Id.*

Finally, the "special reclamation tax" is set out under W. Va.Code § 22–3–11. Under this statute, a tax is imposed on "every person conducting coal surface mining operations[.]" *Id.* This tax is imposed at the rate of $0.03 per ton of coal mined. The taxes collected under this statute are to be placed in a special reclamation fund. It is further provided by the statute that the taxes collected for the fund are to be expended "for the reclamation and rehabilitation of lands which were subjected to permitted surface mining operations and abandoned ... and where the land is not eligible for abandoned mine land reclamation funds[.]" *Id.*

The coal severance taxes imposed by the above statutes are not unique. Other jurisdictions that produce coal have similar coal severance tax statutes.[7] *See, e.g.,* Ala.Code § 40–13–2 (1980) ("There is hereby levied, in

---

**4.** Only five of the six challenged statutes are discussed herein. The sixth statute involved in this case, W. Va.Code § 11–13A–4, defines certain aspects of mining that may be taxed. This statute is set out and discussed in Section C, *infra.*

**5.** *See* W. Va.Code § 11–13A–6(b) ("Seventy-five percent of the net proceeds of this additional tax on coal shall be distributed ... to the various counties of this state in which the coal ... was located at the time it was severed from the ground.... The remaining twenty-five percent of the net proceeds of this additional tax on coal shall be distributed among all the counties and municipalities of this state[.]").

**6.** This statute further provides that "the minimum severance tax on coal may not be imposed on any ton of coal produced on or after the first day of April, two thousand, on which the severance tax is imposed by the provisions of [W. Va.Code § 11–13A–3]." W. Va.Code § 11–12B–3.

**7.** "Most of the States raise revenue by levying a severance tax on mineral production. The first such tax was imposed by Michigan in 1846. By 1979, 33 States had adopted some type of severance tax." *Commonwealth Edison Co. v. Montana,* 453 U.S. 609, 624 n. 13, 101 S.Ct. 2946, 2957 n. 13, 69 L.Ed.2d 884 (1981) (citations omitted).

addition to all other taxes imposed by law, an excise and privilege tax on every person severing coal within Alabama."); Kan. Stat. Ann. § 79–4217(a) (2005) ("There is hereby imposed an excise tax upon the severance and production of coal[.]"); Ky.Rev.Stat. Ann. § 143.020 (1978) ("For the privilege of severing or processing coal, in addition to all other taxes imposed by law, a tax is hereby levied on every taxpayer engaged in severing and/or processing coal within this Commonwealth[.]"); La. Stat. Ann. § 47:631 (1997) ("Taxes as authorized by Article VII, Section 4 of the Constitution of Louisiana are hereby levied upon all natural resources severed from the soil ... including ... coal, lignite, and ores[.]"); Mont. Stat. Ann. § 15–35–103(1) (1995) ("A severance tax is imposed on each ton of coal produced in the state in accordance with the following schedule ...."); Mont. Const. art. 9, § 5 (1979) ("The legislature shall dedicate not less than one-fourth (¼) of the coal severance tax to a trust fund[.]"); N.M. Stat. Ann. § 7–26–6(A) (1993) ("The severance tax on coal is measured by the quantity of coal severed and saved. The taxable event is sale, transportation out of New Mexico or consumption of the coal, whichever first occurs."); N.D. Cent.Code § 57–61–01 (2001) ("There is hereby imposed upon all coal severed for sale or for industrial purposes by coal mines within the state a tax[.]"); N.D. Cent.Code § 57–61–01.5(1) (1995) ("The state tax commissioner shall transfer revenue from the tax imposed by this section to the state treasurer for deposit in a special fund in the state treasury, which is hereby created, to be known as the lignite research fund. Such moneys must be used for contracts for land reclamation research projects and for research, development, and marketing of lignite and products derived from lignite."); Ohio Rev.Code § 5749.02(A) (2005) ("For the purpose of providing revenue to administer the state's coal mining and reclamation regulatory program, to meet the environmental and resource management needs of this state, and to reclaim land affected by mining, an excise tax is hereby levied on the privilege of engaging in the severance of natural resources from the soil or water of this state."); Tenn.Code Ann. § 67–7–103(a) (1981) ("There is hereby levied a severance tax on all coal products severed from the ground in Tennessee. The tax is levied upon the entire production in the state regardless of the place of sale or the fact that delivery may be made outside the state."); Tenn.Code Ann. § 67–7–110(a) (2005) ("The [coal] tax shall be levied for the use and benefit of local governments only and all revenues collected from the tax, except deductions for administration and collection provided for in this part, shall be allocated to the county from which such coal products were severed."); Wy. Stat. Ann. § 39–14–103(a)(i) (1999) ("There is levied a severance tax on the value of the gross product for the privilege of severing or extracting both surface and underground coal in the state.").

The general purpose behind coal severance taxes was succinctly stated by a commentator as follows:

Two rationales are advanced to support the imposition of severance taxes. One is that mining or resource production imposes burdens upon the host community for which it should be compensated. By this view, severance taxes are necessary to repay the levying jurisdiction for damage to its infrastructure, environment, lifestyle and heritage caused by extraction of natural resources....

A second rationale supporting imposition of severance taxes is the need of the state for revenues to pay for public services, quite apart from those provided to the severing industry.

John S. Lowe, *Severance Taxes as an Issue of Energy Sectionalism*, 5 Energy L.J. 357, 360–61 (1984). Another commentator has addressed the purposes behind coal severance taxes more extensively as follows:

Increased coal severance tax rates have enabled coal producing states to achieve a variety of policy goals designed to reduce the burden that coal production places upon them. The first of these goals is to use severance tax revenue to compensate the states' future generations for the irretrievable loss of their coal resource.... This is accomplished by placing a percentage of the severance tax revenue into a permanent trust fund to be drawn upon to

aid the states' economies when the coal resources inevitably are depleted.

A second goal of increased severance taxes is to force coal producers to internalize the impact costs that they impose upon the states. Coal production requires additional state government expenditures to provide environmental monitoring, road construction, and other related services. Despite strict state and federal reclamation laws, coal mining causes irreversible damage to the land and to the natural aquifers beneath it. Indirectly, coal production harms the public health and threatens the social well-being of mining communities. The states, by including these costs in the calculation of severance tax rates, compel coal producers to raise the price of coal to levels that reflect the public costs of coal production.

Use of coal severance taxes as regulatory mechanisms to control mining rates and methods is another goal of increased severance tax rates. In many instances, when states raise their severance tax levels, the price of coal may rise high enough to reduce the rate of extraction. A slower extraction rate can soften the harsh effects of rapid coal development. Levying a higher severance tax on coal mined by undesirable methods can encourage producers to use less objectionable methods.

. . . .

The emergence of state severance taxation as a means of protecting local interests from rapid coal development affords coal states greater control over coal development. In light of the history of mineral exploitation ... and the shortcomings of federal aid, the assertion of state sovereign powers to meet the increasing social and economic demands created by coal production has come as no surprise. The rise of severance taxation, in fact, has been welcomed as an effective means of meeting the distinctive demands place[d] upon each coal producing state by the new coal rush. The legislatures of coal producing states have shown great care in crafting sever-

ance tax schemes that ensure adequate revenues to provide for the needs of impacted areas, while preserving the health of the local coal industry.

Daniel L. Harris, *Western Coal Severance Taxes and Congress: A Question of State Sovereignty,* 61 Or. L.Rev. 589, 591–611 (1982).

It is clear from the above discussion that the coal severance tax statutes assailed in this case are presumptively a valid exercise of the State's sovereignty. *See Central Realty Co. v. Martin,* 126 W.Va. 915, 920, 30 S.E.2d 720, 723 (1944) ("The power to tax property and the citizens of a state is an attribute of sovereignty derived from necessity, and is one of the inherent powers of government."). The taxpayers have attempted to overcome this strong presumption by making the two Import–Export Clause arguments that are discussed below.

**B. Assessment of Severance Taxes Based upon Sale Price**

The first argument raised by the taxpayers is that, to the extent that the amount of severance taxes for exported coal is determined by the exported sale price, the taxes violate the Import–Export Clause.[8] This argument is disingenuous because it looks at the severance taxes in isolation from the purpose for which they are imposed. To buttress their flawed argument, the taxpayers rely upon *Richfield Oil Corp. v. State Board of Equalization,* 329 U.S. 69, 67 S.Ct. 156, 91 L.Ed. 80 (1946).

*Richfield* involved a general sales tax that the state of California imposed upon the sale of all goods. This tax was imposed upon the sale of oil that was made to a foreign entity. The Supreme Court struck down the tax as violating the Import–Export Clause. The taxpayers in the instant case take the position that *Richfield* stands for the proposition that the Import–Export Clause prohibits assessment of a tax based upon the contract sale price. Nothing in *Richfield* remotely stands for such a proposition. *Richfield* simply stands for the proposition that a tax, regardless of how it is determined, cannot be

---

8. As I previously mentioned, none of the severance taxes impose a different tax or taxing method upon coal. To the extent that a sale price is used to determine the amount of a severance tax, the method applies regardless of whether the coal is sold in the United States or abroad.

imposed upon goods that are in export transit. *See Louisiana Land & Exploration Co. v. Pilot Petroleum Corp.*, 900 F.2d 816, 821 (5th Cir.1990) (applying *Richfield* to strike down a tax that was imposed upon goods that were in transit).

The argument raised by the taxpayers in this case was examined in the context of the Commerce Clause in *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981). *Commonwealth Edison* was filed by several Montana coal producers, and their utility customers in other states, challenging Montana's coal severance tax. One of the issues raised in *Commonwealth Edison* was that the tax was discriminatory "because 90% of Montana coal is shipped to other States under contracts that shift the tax burden primarily to non-Montana utility companies and thus to citizens of other States." *Commonwealth Edison*, 453 U.S. at 617–18, 101 S.Ct. at 2953–54. The Supreme Court rejected this argument and upheld Montana's coal severance tax.

The coal severance tax that was imposed by Montana, like West Virginia, allowed for the tax to be determined based upon the contract sale price. *Commonwealth Edison* stated that under Montana's statute, "the value of the coal is determined by the 'contract sales price' which is defined as 'the price of coal extracted and prepared for shipment f. o. b. mine[.]' " *Commonwealth Edison Co. v. Montana*, 453 U.S. at 613 n. 1, 101 S.Ct. at 2951 n. 1. More importantly, *Commonwealth Edison* stated that "the Montana tax is computed at the same rate regardless of the final destination of the coal, and there is no suggestion here that the tax is administered in a manner that departs from this even-handed formula." *Commonwealth Edison*, 453 U.S. at 618, 101 S.Ct. at 2954. Finally, the decision in *Commonwealth Edison* placed Montana's severance tax in the proper context of its general purpose:

Furthermore, there can be no question that Montana may constitutionally raise general revenue by imposing a severance tax on coal mined in the State. The entire value of the coal, before transportation, originates in the State, and mining of the coal depletes the resource base and wealth of the State, thereby diminishing a future source of taxes and economic activity. In many respects, a severance tax is like a real property tax, which has never been doubted as a legitimate means of raising revenue by the situs State (quite apart from the right of that or any other State to tax income derived from use of the property). When, as here, a general revenue tax does not discriminate against interstate commerce and is apportioned to activities occurring within the State, the State is free to pursue its own fiscal policies, unembarrassed by the Constitution, if by the practical operation of a tax the state has exerted its power in relation to opportunities which it has given, to protection which it has afforded, to benefits which it has conferred by the fact of being an orderly civilized society.

*Commonwealth Edison*, 453 U.S. at 624–25, 101 S.Ct. at 2957 (internal quotation marks and citations omitted).

Although *Commonwealth Edison* was litigated in the context of the Commerce Clause,[9] the opinion nevertheless stands for the proposition that a state may impose a coal severance tax that is determined by the contract sale price of the coal, regardless of where the coal is ultimately destined. *See* Ky.Rev.Stat. § 143.010(6)(a) (2005) ("For coal severed and/or processed and sold during a reporting period, gross value shall be the amount received or receivable by the taxpayer."); Mont.Code Ann. § 15–35–103 (1995) (formula for tax based upon contract sale price); N.M. Stat. Ann. § 7–26–6(A) (1993) ("The taxable event is sale, transportation out of New Mexico or consumption of the coal, whichever first occurs."); Wy. Stat. Ann. § 39–14–103(b)(vii)(A) (1998) ("The sales value of extracted coal shall be the selling price pursuant to an arms-length contract.").

**9.** "The policies animating the Import–Export Clause and the Commerce Clause are much the same." *Japan Line, Ltd. v. Los Angeles County*, 441 U.S. 434, 449 n. 14, 99 S.Ct. 1813, 1822 n.

14, 60 L.Ed.2d 336 (1979). *See Itel Containers Int'l Corp. v. Huddleston*, 507 U.S. 60, 77, 113 S.Ct. 1095, 1106, 122 L.Ed.2d 421 (1993).

### C. Taxing the Loading of Coal

The final issue raised by the taxpayers involves W. Va.Code § 11–13A–4(a)(1). Under this statute, treatment processes that are considered part of mining and are taxable include "[c]leaning, breaking, sizing, dust allaying, treating to prevent freezing and loading for shipment." [10] *Id. See also* Ky.Rev. Stat. § 143.010(8) (2005) (" 'Processing' includes cleaning, breaking, sizing, dust allaying, treating to prevent freezing, or *loading or unloading for any purpose.*" (emphasis added)); Wy. Stat. Ann. § 39–14–101(a)(vii) (1998) (" 'Processing' means crushing, sizing, milling, washing, drying, refining, upgrading, ... compressing, storing, *loading for shipment* [.]" (emphasis added)). The taxpayers contend that the Import–Export Clause prohibits taxing the loading of coal for shipment. The majority opinion in this case has correctly rejected this argument.

An "essential problem in cases involving the constitutional prohibition against taxation of exports has ... been to decide whether a sufficient commencement of the process of exportation has occurred so as to immunize the [goods] at issue from state taxation." *Kosydar v. National Cash Register Co.,* 417 U.S. 62, 67, 94 S.Ct. 2108, 2111, 40 L.Ed.2d 660 (1974). An early Supreme Court case addressing this issue was *Coe v. Errol,* 116 U.S. 517, 6 S.Ct. 475, 29 L.Ed. 715 (1886). *Coe* involved a shipment of logs that were floated down the Androscoggin River for manufacture and sale in Lewiston, Maine. The logs were detained by low water in the town of Errol, New Hampshire, where a number of taxes were assessed against them. The owners of the logs protested the assessments, in part, on the grounds that the logs were immune from taxation under the Import–Export Clause. The Supreme Court of New Hampshire sustained the tax, and the United States Supreme Court affirmed. In doing so, *Coe* provided the following analysis:

> There must be a point of time when [goods] cease to be governed exclusively by the domestic law, and begin to be governed and protected by the national law of commercial regulation, and that moment seems to us to be a legitimate one for this purpose, in which they commence their final movement for transportation from the state of their origin to that of their destination. When the products of the farm or the forest are collected, and brought in from the surrounding country to a town or station serving as an entrepot for that particular region, whether on a river or a line of railroad, such products are not yet exports; nor are they in process of exportation; nor is exportation begun until they are committed to the common carrier for transportation out of the state to ... their destination.... Until then it is reasonable to regard them as not only within the state of their origin, but as a part of the general mass of property of that state, subject to its jurisdiction, and liable to taxation there, if not taxed by reason of their being intended for exportation, but taxed, without any discrimination, in the usual way and manner in which such property is taxed in the state.

*Coe,* 116 U.S. at 525, 6 S.Ct. at 477. *See Kosydar v. National Cash Register Co.,* 417 U.S. at 67, 94 S.Ct. at 2111 (discussing *Coe* ).

The initial decisions by the Supreme Court addressing the issue of the actual loading and unloading of vessels held that this activity was immune from local business taxes. *See Puget Sound Co. v. Tax Comm'n,* 302 U.S. 90, 58 S.Ct. 72, 82 L.Ed. 68 (1937); *Joseph v. Carter & Weekes Co.,* 330 U.S. 422, 67 S.Ct. 815, 91 L.Ed. 993 (1947). In a later decision, *Canton Railroad Co. v. Rogan,* 340 U.S. 511, 71 S.Ct. 447, 95 L.Ed. 488 (1951), the Supreme Court revisited the subject. In *Canton* a railroad company argued that the Import–Export Clause prohibited the state from taxing goods loaded on and unloaded from its trains. The Supreme Court found that it did not have to address that issue because the railroad company did not actually perform loading and unloading. However, the Court noted the following in dicta:

> To export means to carry or send abroad; to import means to bring into the country. Those acts begin and end at water's edge. The broader definition

---

**10.** This statute applies only to the severance privilege tax under W. Va.Code § 11–13A–3, and the severance tax for local governments under W. Va.Code § 11–13A–6.

which appellant tenders distorts the ordinary meaning of the terms. It would lead back to every forest, mine, and factory in the land and create a zone of tax immunity never before imagined. For if the handling of the goods at the port were part of the export process, so would hauling them to or from distant points or perhaps mining them or manufacturing them. The phase of the process would make no difference so long as the goods were in fact committed to export or had arrived as imports.

*Canton*, 340 U.S. at 515, 71 S.Ct. at 449.

The decision in *Department of Revenue of Washington v. Association of Washington Stevedoring Cos.*, 435 U.S. 734, 98 S.Ct. 1388, 55 L.Ed.2d 682 (1978), marked a departure from the Supreme Court's earlier ban on taxing the incident of loading and unloading exported goods. The decision in *Stevedoring* involved a tax imposed by the state of Washington on companies that loaded and unloaded imported and exported goods from vessels. The courts in the state found that the tax violated the Import–Export Clause and Supreme Court precedents in *Puget Sound Co. v. Tax Commission*, 302 U.S. 90, 58 S.Ct. 72, 82 L.Ed. 68 (1937), and *Joseph v. Carter & Weekes Co.*, 330 U.S. 422, 67 S.Ct. 815, 91 L.Ed. 993 (1947).[11] The case was appealed to the United States Supreme Court.

In determining whether the tax violated the Import–Export Clause, the Supreme Court noted that under *Michelin Tire Corp. v. W.L. Wages*, 423 U.S. 276, 96 S.Ct. 535, 46 L.Ed.2d 495 (1976), the analysis under that Clause had changed dramatically:

Previous cases had assumed that all taxes on imports and exports and on the importing and exporting processes were banned by the Clause. Before *Michelin*, the primary consideration was whether the tax under review reached imports or exports....

*Michelin* initiated a different approach to Import–Export Clause cases. It ignored the simple question whether the [goods] were imports. Instead, it analyzed the nature of the tax to determine whether it was an Impost or Duty. Specifically, the analysis examined whether the exaction offended any of the three policy considerations leading to the presence of the Clause[.]

*Stevedoring*, 435 U.S. at 752, 98 S.Ct. at 1400 (internal citations omitted). Using the test under *Michelin*, the Supreme Court found that Washington's tax on loading and unloading goods did not violate the Import–Export Clause:

A similar approach demonstrates that the application of the Washington business and occupation tax to stevedoring threatens no Import–Export Clause policy. First, the tax does not restrain the ability of the Federal Government to conduct foreign policy. As a general business tax that applies to virtually all businesses in the State, it has not created any special protective tariff. The assessments in this case are only upon business conducted entirely within Washington. No foreign business or vessel is taxed. Respondents, therefore, have demonstrated no impediment posed by the tax upon the regulation of foreign trade by the United States.

Second, the effect of the Washington tax on federal import revenues is identical to the effect in *Michelin*. The tax merely compensates the State for services and protection extended by Washington to the stevedoring business. Any indirect effect on the demand for imported goods because of the tax on the value of loading and unloading them from their ships is even less substantial than the effect of the direct ad valorem property tax on the imported goods themselves.

Third, the desire to prevent interstate rivalry and friction does not vary significantly from the primary purpose of the Commerce Clause. The third Import–Export Clause policy, therefore, is vindicated if the tax falls upon a taxpayer with reasonable nexus to the State, is properly apportioned, does not discriminate, and relates reasonably to services provided by the State....

Under the analysis of *Michelin*, then, the application of the Washington business

---

11. The lower courts also found the tax violated the Commerce Clause.

and occupation tax to stevedoring violates no Import–Export Clause policy and therefore should not qualify as an "Impost or Duty" subject to the absolute ban of the Clause.

*Stevedoring,* 435 U.S. at 754–55, 98 S.Ct. at 1401–02 (internal citation omitted).

*Stevedoring* stands for the proposition that taxing the service of "loading or unloading" imported or exported goods does not offend the Import–Export Clause. The taxpayers have attempted to distinguish *Stevedoring* by arguing that the tax in that case was not imposed on the actual goods. This point is well taken, because the decision in *Stevedoring* expressly stated that it did "not reach the question of the applicability of the *Michelin* approach when a State directly taxes imports or exports in transit." *Stevedoring,* 435 U.S. at 734 n. 23, 98 S.Ct. at 1403 n. 23. However, two problems exist with the taxpayers' attempt to distinguish the application of *Stevedoring* to the tax imposed for loading under W. Va.Code § 11–13A–4(a)(1).

First, W. Va.Code § 11–13A–4(a)(1) is not a tax on coal. The tax is imposed on the service of "loading" coal for shipment. This is exactly what was taxed in *Stevedoring.* Second, the loading that occurred in the instant case was not the commencement of "in transit," for the purposes of the Import–Export Clause. The coal would only be considered "in transit" once it was actually on the train cars. *See Richfield,* 329 U.S. at 83, 67 S.Ct. at 164 ("[T]he commencement of the export would occur no later than the delivery of the [goods] *into the vessel.*" (emphasis added)).[12] *See also Kanawha Eagle Coal, LLC v. Tax Comm'r of State of West Virginia,* 216 W.Va. 616, 623, 609 S.E.2d 877, 884 (2004) ("The initial loading of fully processed clean coal at the preparation plant for shipment is one of the specified activities viewed

as a taxable event associated with the privilege of mining in this state."); *Tradewater Min. Co. v. Revenue Cabinet Com. of Ky.,* 753 S.W.2d 551, 552 (Ky.1988) ("Loading for shipment at the processing plant is the last step in the continuing mining process."); *Portland Pipe Line Corp. v. Environmental Improvement Comm'n,* 307 A.2d 1 (Me.1973) (holding that tax imposed upon off-loading of oil rather than upon oil itself and was not prohibited by Import–Export Clause).

Based upon the foregoing analysis, I respectfully concur.

BENJAMIN, J., concurring, in part and dissenting, in part.

(Filed Jan. 4, 2006)

I agree with the conclusions of the majority decision, albeit for different reasons, that the majority of coal-related taxes[1] at issue do not violate the Import–Export Clause of the United States Constitution. I do not agree that all taxes at issue, as applied, are constitutional. Specifically, I conclude that, pursuant to *Richfield Oil Corporation v. State Board of Equalization,* 329 U.S. 69, 67 S.Ct. 156, 91 L.Ed. 80 (1946), two specific coal-related taxes found in W. Va.Code §§ 11–13A–1 *et seq.,*[2] as applied, violate the Import–Export Clause. I am further of the opinion that, pursuant to *Hope Natural Gas Co. v. Hall,* 102 W.Va. 272, 135 S.E. 582 (1926), *aff'd.* 274 U.S. 284, 47 S.Ct. 639, 71 L.Ed. 1049 (1927), the scope of these two taxes may be restrained to remove that part of each such tax's application which constitute a violation of the Import–Export Clause.

### A. State Taxes Relating to Coal at Issue

A tax by any other name is still a tax. To refer to all taxes at issue in this appeal simply as "severance" taxes suggests erroneously that the only activity which creates tax liability is the removal of coal from the earth

---

12. The taxpayers' attempt to rely upon *Richfield* as barring the tax on loading is simply not persuasive, because *Richfield* did not prohibit a tax on the service of "loading"; rather, it prohibited California from *taxing oil that was in transit* after it was loaded onto a ship.

1. The taxes which I conclude do not violate the Import–Export Clause are the Minimum Severance Tax Act (W. Va.Code § 11–12B–1, *et seq.*), the Surface Coal Mining and Reclamation Act

(W. Va.Code § 22–3–11), and the Special Tax on Coal Production for the Mining and Reclamation Operations Fund (W. Va.Code § 22–3–32).

2. These "Section 13A" taxes are the Basic Severance Tax (W. Va.Code § 11–13A–3) and the Additional Severance Tax on Coal (W. Va.Code § 11–13A–6(a)). These "Section 13A" taxes derive from the Severance and Business Privilege Tax Act of 1993 (W. Va.Code §§ 11–13A–1, *et seq.*).

of this State.[3] Other activities also create liability for some of the taxes, such as treatment processes and the loading of coal for shipment. The primary issue before this Court is therefore not the name which the State wishes to attach to the taxes it seeks to collect, but whether such taxes, *by their operation and effect,* violate the Import–Export Clause of the United States Constitution. *See Richfield Oil Corp. v. State Board of Equalization,* 329 U.S. 69, 84, 67 S.Ct. 156, 164, 91 L.Ed. 80 (1946).

Here, I believe the taxes at issue are more properly termed "privilege" taxes which result in taxes being assessed on a tonnage basis or an *"ad valorem"* taxes based upon a percentage of the value added to coal by certain activities engaged in by appellants. It is this operation and effect of these specific coal-related taxes at issue in this appeal which is determinative to the propriety of such taxes. Therefore, I disagree with the majority decision's lack of a specific delineation and consideration of the operation and effect of the coal-related taxes at issue. It is this consideration of the operation and effect of each such tax which, I believe, is crucial to the determination of the effect of the binding precedent applicable to the Import–Export Clause questions on this appeal.

### 1. Non-"Section 13A Taxes"

There are two [4] coal-related taxes identified by appellants in their brief at issue on this appeal which I believe do not violate the Import–Export Clause. These taxes are a tax under the "Minimum Severance Tax Act" found at W. Va.Code § 11–12B–3(a), and a special tax on coal production under the Surface Mining and Reclamation Act for the Mining and Reclamation Operations Fund found at W. Va.Code § 22–3–32. Both taxes are similar with respect to the activities taxed and the measures by which the taxes are imposed. It is these similarities which distinguish these two taxes from the "Section 13A taxes" which I find problematic under the Import–Export Clause.

These two non-"Section 13A taxes" tax the privilege of "severing, extracting, reducing to possession or producing coal for sale, profit or commercial use" and measure the taxes in terms of specified "cents per ton of coal produced ... for sale, profit or commercial use." W. Va.Code § 11–12B–3(a), § 22–3–32. Thus, these are tonnage taxes, not *"ad valorem"* value taxes.

The principal differences between these taxes and the "Section 13A taxes" are that these taxes do not tax activities beyond the production of the coal and that they measure the taxes in terms of "cents per ton of coal produced ... for sale, profit or commercial use." *Id.* I do not find that their application offends the Import–Export Clause of the United States Constitution.[5]

### 2. "Section 13A Taxes"

As with the non-"Section 13A taxes" related to coal, the "Section 13A taxes" at issue

3. Appellee suggested strongly at argument that a proper reason for the taxes at issue in this litigation is the desire for the State to be compensated in some manner or to otherwise receive "severance" tax proceeds for the permanent removal of a natural resource from the state. I find this argument misleading since West Virginia may apply such "severance" taxes whether the coal is mined in West Virginia *or some other state.* 110 W. Va.C.S.R. § 13A–2a.5.2. While this argument may have some political appeal, it is ultimately irrelevant, in my opinion, to the outcome of this appeal. The issue before this Court is not the name which the State wishes to attach to a tax it seeks to . collect, but whether that tax, *by its operation,* violates the Import–Export Clause of the United States Constitution.

4. An additional tax under the Surface Coal Mining and Reclamation Act for the Special Reclamation Fund, found at W. Va.Code § 22–3–11(h) is not specified by appellants as being at issue on

this appeal. As noted by the Tax Commissioner in his brief, there is some confusion whether appellants are contesting this tax because appellants seemed to implicate this tax in appellants' arguments in the administrative proceeding below. Neither the administrative decision nor Judge Kaufman's decision below reference this tax as being in dispute. Whatever confusion existed below, this tax is not manifestly different in its operation from the other delineated non-"Section 13A" considered herein.

Yet another "severance" tax is the Additional Tax on the Privilege of Severing Coal under the Workers' Compensation Debt Reduction Act, found at W. Va.Code § 11–13V–4(a). This tax did not become effective until November 1, 2005. Appellants have not listed this tax as being in dispute on this appeal.

5. While one might argue whether the term "producing" extends a taxable incident or activity into the stream of export, and thus subject to a

on this appeal are privilege taxes; that is, taxes upon the privilege of engaging in certain specified activities. Although denominated as taxes upon privileges, the taxes are in operation and effect upon the activities specified as privileges. Their calculation is based upon a percentage of the value of the coal enhanced by such activities.

The "Section 13A taxes" at issue arise under the Severance and Business Privilege Tax Act of 1993. Specifically, as delineated by appellants in their brief, there is a "basic severance tax" found at W. Va.Code § 11–13A–3(a), (b) and (f), and an "additional severance tax", found at W. Va.Code § 11–13A–6(a).[6] In language similar to that used by the non-"Section 13A taxes", the Section 13A "basic severance tax" imposes a coal tax on "severing, extracting, reducing to possession and producing for sale, profit or commercial use" activities. The Section 13A "additional severance tax" uses slightly different language, specifying the activities it taxes as

"severing coal, or preparing coal (or both severing and preparing coal) for sale, profit or commercial use." Whether there is a substantive difference in this language is not readily apparent.

Unlike the non-"Section 13A taxes", both the basic and additional severance taxes under Section 13A also tax "[t]he following treatment processes (and the treatment processes necessary or incidental thereto) when applied by the mine owner or operator to [coal] mined in this state[:] ... Cleaning, breaking, sizing, dust allaying, treating to prevent freezing and loading [of coal] for shipment." W. Va.Code § 11–13A–4(a). Also unlike the non-"Section 13A taxes" which are tonnage taxes, the tax imposed by the "Section 13A taxes" is a value tax derived from a percentage of the ultimate sale of the coal by the producer. The Section 13A basic tax imposes tax in terms of a specified percentage "of the gross value"[7] as shown by

---

*Richfield Oil* condemnation, I do not believe that is possible because of the statutory definition of production. Support for this conclusion is found in this Court's decision in *Gilbert Imported Hardwoods, Inc. v. Dailey*, 167 W.Va. 587, 280 S.E.2d 260 (1981). The issue in *Gilbert* was "whether the processing of raw coal through Gilbert's tipples was part of the 'business of severing, extracting, reducing to possession and producing for sale, profit or commercial use [coal]" under the State's then Business and Occupation Tax. *Id.* at 595, 280 S.E.2d at 265. This Court ruled that "[t]he production of coal, for the purposes [of the language just quoted] ends when the coal is reduced to possession on the surface." *Id.* at 596, 280 S.E.2d at 266. Accordingly, I am of the opinion that none of the activities taxed by the coal production/tonnage taxes extends to coal in the export stream, which is well beyond the time when production ends. *Consolidation Coal Company v. United States*, 64 Fed.Cl. 718 (2005), an Export, not an Import–Export, Clause case is not to the contrary. There the federal reclamation fee exaction fell upon "coal produced". "Produced" had a more expansive meaning in that context than it does with respect to the non-"Section 13A taxes" relating to coal at issue herein

6. Not referenced by appellants in their brief as a tax at issue on this appeal is a tax upon the extraction and recovery of coal from a refuse pile, a gob pile or from other waste sources and the subsequent processing, washing and preparation thereof to produce coal for sale, profit or commercial use under the Severance and Business Privileges Tax Act of 1993, found at W. Va.Code § 11–13A–3e. Apparently, none of the

coal exported by appellants was extracted or recovered from a refuse, gob pile, or other waste source.

7. "Gross value" is defined in W. Va.Code 11–13A–2(c)(6) as "the market value of the [coal], in the immediate vicinity where severed, determined after application of post production processes generally applied by the industry to obtain commercially marketable or usable [coal]." "For [coal], 'gross value' is to be reported as follows: (A) For [coal] severed or processed (or both severed and processed) and sold during a reporting period, gross value is the gross proceeds received or receivable by the taxpayer." W. Va.Code 11–13A–2(c)(6). There follows subparagraphs (B) through (F) of paragraph (6) of subsection (c) of W. Va.Code 11–13A–2 which describe how "gross value" is to be reported in a variety of situations. Subparagraph (c), for example, provides that "[i]n the absence of a sale, gross value shall be the fair market value for [coal] of similar grade and quality." Note that the statutory definition of "gross value" in declaring how "gross value" is to be reported when the coal is sold states that "gross value is the gross proceeds received or receivable by the taxpayer." "Gross proceeds" as used in the foregoing definition is defined in W. Va.Code 11–13A–2(b)(5) as meaning "the value, whether in money or other property, actually proceeding from the sale or lease of tangible personal property ... without any deduction for the cost of property sold or leased or expenses of any kind." In W. Va.Code 11–13A–3(a), the Legislature has declared that "the gross value of the [coal] produced [is] as shown by the gross income derived

the gross income derived from the sale of the coal. The Section 13A supplemental tax imposes tax in terms of a percentage of the "value"[8] of the coal severed and/or "prepared"[9] as shown by the gross "proceeds"[10] derived from the sale of the coal.

Accordingly, the principal differences between the coal-related taxes at issue on this appeal are that the non-"Section 13A taxes" do not tax activities beyond the production of the coal and that such taxes are tonnage taxes. The "Section 13A taxes" tax activities beyond the production of the coal, including the loading of the coal for shipment, and measure the tax in terms of a percentage of the value or gross value of the coal as shown by the gross income or gross proceeds derived by the sale of the coal. As such, the tax fixed by the "Section 13A taxes" include a component of enhanced value of the coal derived by the activity of the producer loading coal for shipment.

### B. The Import–Export Clause

It is perhaps understandable that fair minds would disagree on the outcome of a case such as this. The law applicable to the issues raised in this appeal are by no means subject to a simple application of non-divergent case-law. Indeed, one might understandably hope that the United States Supreme Court would take the opportunity to bring a new clarity to this area of constitutional law in the near future.

It is, I believe, fundamental to our consideration of the issues raised on appeal that this Court embrace and enforce that precedent of the United States Supreme Court which best protects the rights and provisions

set forth in the United States Constitution. I do not believe that applicable precedent should be ignored or minimized because another line of cases is more to a court's liking. In *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989), the United States Supreme Court admonished lower courts that "[i]f [its] precedent has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, [the lower court] should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." 490 U.S. at 484, 109 S.Ct. at 1921–22, 104 L.Ed.2d at 526.

The loading of coal for shipment is, like the severance of coal, a taxable activity under the "Section 13A taxes." W. Va.Code § 11–13A–4(a). For appellant's coal which is irretrievably destined for a foreign market and which is taxed under the provisions of the "Section 13A taxes", the loading of the coal for final transportation, with its concomitant irrevocable commitment of the coal to the foreign market, results in the latest passage of title and completion of the sale.[11] The "Section 13A taxes" set the amount of tax to be payed as a percentage of the gross value of the coal as determined by the sale price of the coal. Necessarily included within this sale price is a component of enhanced value added by the loading of the coal for final shipment. Therefore, it is readily apparent that the tax is set by the value of coal dedicated for a foreign market after that coal's value has been enhanced by the loading activity in apparent violation of the Import–Export Clause.[12]

---

from the sale [of the coal] by the producer." "Gross income", unlike "gross proceeds", is not statutorily defined.

8. "Gross value" is statutorily defined. "Value" is not.

9. The additional tax uses the term "prepared" rather than "processed" as used by the basic tax.

10. The basic tax uses the term "gross income."

11. One may argue that this irrevocable commitment of the coal to the foreign market might take place earlier in time, such as when the coal arrives at the final port of shipping. Contrary to the position that the moment when the coal

becomes an export is difficult to ascertain, I disagree. The coal enters the export stream of commerce the moment it is segregated from domestic coal and is irretrievably committed to the foreign market. That may occur as early as the removal of the coal from the coal pile during final loading, and certainly occurs no later that the coal reaching a coal car destined for a foreign market.

12. Although the Tax Commissioner now disavows legal reasoning he employed in his earlier administrative decision and in his response to the petition for appeal in the circuit court, he therein conceded that (1) immediately following the processing of the coal, it is immediately

Recognizing our obligation to precedent, I believe that we must abide by the United States Supreme Court's interpretation of the Import–Export Clause as set forth in *Richfield Oil*. I therefore disagree with the majority of my colleagues and believe that *Richfield Oil's* "stream-of-export" rule, rather than, as they believe, the policy rule [13] set forth in *Michelin Tire Corp. v. Wages*, 423 U.S. 276, 96 S.Ct. 535, 46 L.Ed.2d 495 (1976) and *Department of Revenue v. Association of Washington Stevedoring Companies*, 435 U.S. 734, 98 S.Ct. 1388, 55 L.Ed.2d 682 (1978), provides the precedent that should control the judicial outcome of the issues raised on this appeal.

My problem with the majority opinion is that it seems to presume that *Richfield Oil's* "stream-of-export" rule has been overruled or disregarded by the United States Supreme Court in favor of *Michelin's* policy rule with respect to taxes, as here, on goods or products in the stream of export. The majority opinion asserts that the Supreme Court "took a sharp turn" in *Michelin*. Sharp or not, the turn has *not* been applied to state taxes on exports in transit.

The Supreme Court acknowledged in *Washington Stevedoring* that it did not reach in that case "the question of the applicability of the *Michelin* approach when a State directly taxes imports or exports in transit ... As in *Michelin*, decided less than three years ago, we prefer to defer decision until a case with pertinent facts is presented. At that time, with full argument, the issue with all its ramifications may be decided." 435 U.S. at 757, n. 23, 98 S.Ct. at 1403. Indeed, in the more recent case of *United States v. International Business Machines Corp, ["I.B.M."]*, 517 U.S. 843, 116 S.Ct. 1793, 135 L.Ed.2d 124 (1996), the United States Supreme Court stated that "contrary to the Government's contention, this Court's Import–Export Clause cases have not upheld the validity of generally applicable, nondiscriminatory taxes that fall on imports or exports in transit." 517 U.S. at 862, 116 S.Ct. at 1804.[14]

With respect to taxes on the value of goods or products in the stream of export, as I believe the "Section 13A taxes" are, I therefore respectfully disagree with the reasoning of the majority opinion and conclude that, in the words of the Supreme Court in *Rodriguez de Quijas*, the precedent which "directly controls" the issues raised in this appeal is *Richfield Oil*.

### 1. *Richfield Oil*

Distilled to its essence, the Import–Export Clause of the United States Constitution prohibits states from "lay[ing] any Imposts or Duties on ... Exports ...." *United States Constitution*, Art. I, Sec. 10, Cl. 2. For purposes of a *Richfield Oil* analysis, I believe the taxes questioned in this appeal are "Imposts or Duties." 329 U.S. at 76, 67 S.Ct. at 160. Implicit in any consideration of the Import–Export Clause are two basic questions: (1) when is a product an "export"?,

placed in the export stream to foreign customers, (2) "[t]axpayer's coal enters the export stream when it is placed onto rail cars at the [mine]", and (3) "liability for the taxes in question accrues under the statutory law, at the time of sale, in these cases, which is after the coal has entered the continuous stream of export to foreign customers."

**13.** The *Michelin* approach or analysis examined whether the tax exaction offended any of the policy considerations leading to the presence of the Import–Export Clause:

The Framers of the Constitution thus sought to alleviate three main concerns ...: the Federal Government must speak with one voice when regulating commercial relations with foreign governments, and tariffs, which might affect foreign relations, could not be implemented by the States consistently with that

exclusive power; import revenues were to be the major source of revenue of the Federal Government and should not be diverted to the States; and harmony among the States might be disturbed unless seaboard States, with their crucial ports of entry, were prohibited from levying taxes on citizens of other States by taxing goods merely flowing through their ports to the other States not situated as favorably geographically.
423 U.S. at 285–286, 96 S.Ct. at 540–541. (footnotes omitted.)

**14.** Accordingly, it is incorrect to cite *I.B.M.* for the proposition that the Import–Export Clause does not prohibit states from imposing "generally applicable, nondiscriminatory taxes even if those taxes fall on ... exports." That was the Government's argument in *I.B.M.*, which the Supreme Court rejected. 517 U.S. at 852, 862, 116 S.Ct. at 1799, 1804.

and (2) when is there a tax on such an export? *Richfield Oil* addresses both questions in the context of the facts of that case. Those answers are, I believe, determinative of the resolution of the issues in this appeal.

In *Richfield Oil* the Supreme Court was concerned with when the "exportation" or "movement [of a product] abroad" began. The commencement thereof of the product for the foreign market makes the product an export. In *Richfield Oil*, the Court held that oil, the product at issue in that case, became an "export" at the time it was delivered into the hold of a sea-going vessel, at which time it passed into the control of a foreign customer, there being no probability that the oil would thereafter be diverted to domestic use. 329 U.S. at 83, 67 S.Ct. at 164.

In *Richfield Oil*, California had assessed a retail sales tax against the seller/deliverer of the oil measured by the gross receipts from the transaction. The seller protested and sought a refund claiming that the levy of the tax violated the Import–Export Clause. As interpreted by the California Supreme Court, the California tax was described as an excise tax for the privilege of conducting a retail business measured by the gross receipts from sales. It was not a tax on the sale or because of the sale. While the United States Supreme Court in *Richfield Oil* said that it was bound by the California court's construction, being a matter of state law, the Supreme Court found that that determination was not determinative of the question of whether the tax deprived the taxpayer of a federal right, stating "[t]hat issue turns not on the characterization which the state has given the tax, but on **its operation and effect**". 329 U.S. at 84, 67 S.Ct. at 164. (Emphasis added.)

The Supreme Court then made much of a concession by the California court, namely, "that the delivery of the oil 'resulted in the passage of title and the completion of the sale, and the **taxable incident**' ". *Id.* (Emphasis added.) The Supreme Court's holding that the California tax was unconstitutional under the Import–Export Clause was based,

in my opinion, on its conclusion that "[t]he **incident which gave rise to the accrual of the tax was a step in the export process**". *Id.* (Emphasis added.)

The highlighted phrases are, I believe, of importance to navigating the issues in the case on appeal. These phrases, **"operation and effect," "taxable incident," "incident,"** and **"accrual"**, require some consideration. The Supreme Court did not accept the California court's view that the activity or incident taxed by that state's excise tax was the conducting of a retail business and that the gross receipts from sales were only the measure of the tax. Rather, the Court ruled that the **"operation and effect"** of the tax was that it was a tax on the sale of the oil. In other words, the tax *was* a sales tax, as the California court implicitly conceded in describing the completion of the sale as the **"taxable incident"**. When the Supreme Court said that "[t]he **incident which gave rise to the accrual of the tax was a step in the export process"**, the **"incident"** was the sale itself. The gross receipts from the sale was the measure of the tax on the sale itself and not the measure of the tax on the conducting of a retail business because the conducting of a retail business was not a **"taxable incident"**. In using the phrase, "[t]he [taxable] **incident which gave rise to the accrual of the tax"**, the Supreme Court determined that the sale was "[t]he [taxable] **incident"** which created the liability for the California tax.[15]   *Id.* at 84–85, 67 S.Ct. at 164–65

Accordingly, I am of the opinion that *Richfield Oil* stands for the proposition that a coal-related tax is a tax on an export only if (1) an incident or activity involving the coal is taxed simultaneously with, or subsequent to, the commencement of exportation, and (2) that incident or activity contributes or relates to the value of the coal which determines the amount of the tax liability. I do not believe such a coal-related tax would be a tax on an export if the activities or incidents involving coal occurred prior to the commencement of exportation even though the measure of the

---

15. "Accrue" in the context of law is commonly understood as meaning "to become a present and enforceable right or demand." *The Random*

*House Dictionary of the English Language,* The Unabridged Edition (1996).

taxes on such prior activities may not be ascertainable until after the commencement of the exportation. *Accord, Washington Stevedoring.*

## 2. The "Section 13A Taxes" and The Import–Export Clause

At the latest, I believe that the loading of appellant's coal onto a unit train, like the delivery of the oil into the vessel's hold in *Richfield Oil,* marked the commencement of the movement abroad and made the coal an "export". Loading commenced when the coal which was dedicated for a foreign delivery was segregated from domestic coal and ended not with the coal falling into the rail car, as some have contended, but when the coal was on the floor of the rail cars. "Loading" included the filling of the cars. If that were not so, it would be inappropriate to speak of a loaded rail car or a loaded vessel.

This act which made appellants' coal an "export" was also a "taxable incident" under the Severance and Business Privilege Tax Act of 1993. W. Va.Code §§ 11–13A–3(a), 4(a), and 6(a). The tax on that incident was determined in the appellants' case by the coal's gross value as shown by the gross income derived from the sale. This gross value/gross income included a component of value or income attributable to the loading of the coal, a taxable incident that, in the words of *Richfield Oil,* was "a step in the export process". Since appellants engaged in a taxable activity that made the coal an export and thereby incurred an added measure of tax liability because of the export incident, the tax in operation and effect was, in my opinion, on the export itself.

The Supreme Court in the *Washington Stevedoring* case was careful to point out that the Washington tax on stevedoring did

not "relate[ ] to the *value* of the goods" and fell "upon a service distinct from the goods and *their value* ", and, as a consequence, the tax could not "be considered taxation upon the goods themselves". 435 U.S. at 757, 98 S.Ct. at 1403. (Emphasis added.) In this case, the tax on the loading of the coal related to, and fell upon, that part of the value of the coal that was attributable to the loading thereof. Accordingly, the tax became a tax upon the export itself.[16]

I conclude, therefore, that the application of West Virginia's "Section 13A taxes" herein offends the Import–Export Clause of the United States Constitution to the extent that such taxes are calculated based upon the value added to the coal by its loading, since the coal was then in the export-stream of commerce.[17] Taxes calculated based upon activities which occur prior to the coal's entry into the export stream do not violate the Import–Export Clause.

## C. Limitation of the Operation of the "Section 13A Taxes"

In deference to *Richfield Oil* and on the basis of this Court's precedent in *Hope Natural Gas,* I would restrain the activities taxed under W. Va.Code §§ 11–13A–1, *et seq.,* within narrower limits than the words of those Code sections express on the ground that the Legislature did not intend to violate any provision of the United States Constitution. I would accomplish the restraint by deleting from the two "Section 13A taxes" the loading of coal onto a unit train for export shipment as a taxable activity, and by requiring the Tax Commissioner for tax computation purposes in this case to subtract the contribution which such loading made to the gross value/gross proceeds of the coal sold by the appellants to foreign customers.[18]

---

**16.** Conversely, the entire tax paid by appellants for non-"Section 13A taxes" related to value of the coal that was based entirely upon pre-export taxable activities, and therefore did not offend the Import–Export Clause.

**17.** *Commonwealth Edison v. Montana,* 453 U.S. 609, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981), a commerce clause case, in not relevant. There, the activity taxed was limited to the severance of each ton of coal mined with the tax liability measured by a percentage of the contract sales

price. If anything, *Commonwealth Edison* supports my opinion respecting the non-"Section 13A taxes." It is also not contrary to my opinion on the "Section 13A taxes." Montana did not tax the loading of the coal for shipment.

**18.** The severability clause contained in W. Va. Code § 11–13A–21 provides further support for the conclusion that the Legislature intended this Court to restrain the activities taxed under the Severance and Business Privilege Tax Act of 1993 to those which do not offend the United

I find this Court's reasoning in *Hope Natural Gas* to be relevant to the issues in this case. In *Hope Natural Gas*, the tax in question was one that taxed "every person engaging or continuing within this state in the business of mining and producing for sale, profit, or use, any coal, oil, natural gas, limestone, sand or other mineral product, or felling timber for sale, profit, or use." 102 W.Va. at 275, 135 S.E. at 583. The amount of the tax was "equal to the value of the articles produced as shown by the gross proceeds derived from the sale thereof by the producer ... multiplied [by certain specified rates]." *Id.* In the case of natural gas, the rate was "one and seventeen-twentieths of one percent." *Id.*

Hope contended, among other things, that the tax as applied to its natural gas that was transported through its pipe line system and sold to customers in Ohio and Pennsylvania violated the Commerce Clause of the United States Constitution. The Tax Commissioner contended that "there is no tax on the sale of the transportation of the gas or on the proceeds from the sale thereof." 102 W.Va. at 279, 135 S.E. at 584. Rather, "the gross sales price is simply the taxable measure of the commodity." *Id.* Hope, on the other hand, contended that the tax act evidenced a plain intention to tax the gross proceeds of sales in interstate commerce.

This Court held "that the [Tax Commissioner] may not treat the gross proceeds of plaintiff's sales outside the state as the worth of the gas within the state, but that [the Tax

Commissioner] enforce the act upon the value thereof within the state and before it enters interstate commerce." [19] 102 W.Va. at 284, 135 S.E. at 586. In so-holding, this Court observed:

> There is a presumption, however, that the Legislature did not intend to violate any provisions of the federal constitution. In fact, it has been declared our duty to "restrain the operation of the statute within narrower limits than its words import" when satisfied that a literal interpretation will include cases not intended by the Legislature. **Consequently, we are warranted in presuming that the Legislature did not mean to include, as an element of value, so much of the gross proceeds of the sale of an article in interstate commerce as is represented by the cost of transportation, and we restrain the operation of the statute accordingly.**

102 W.Va. at 276, 135 S.E. at 583 (internal citations omitted). (Emphasis added.) [20]

Except for this limited restraint on the operation of the "Section 13A taxes" and resulting subtraction by the Tax Commissioner, I would deny the remainder of Import–Export challenges by appellants based upon *Richfield Oil*. I would order the Tax Commissioner to return to the appellants only that amount of "Section 13A taxes" which were derived from the contribution which the loading for final export made to the gross value/gross proceeds of the coal sold by the appellants to foreign customers.

States Constitution. Therein, the Legislature provided:

> If any provision of this article or the application thereof shall for any reason be adjudged by any court of competent jurisdiction to be invalid, such judgment shall not affect, impair or invalidate the remainder of said article, but shall be confined in its operation to the provision thereof directly involved in the controversy in which such judgement shall have been rendered, and the applicability of such provisions to other persons or circumstances shall not be affected thereby.

W. Va.Code § 11–13A–21.

19. *Hope Natural Gas*, a commerce clause case, involved incidents of a tax and a measure of the tax which were essentially the same as the "Section 13A taxes" except for the processing and

loading activities. In *Hope Natural Gas*, the transportation of the natural gas while in interstate commerce added to the gross proceeds. In such case, were the product in exportation, the gross receipts for tax purposes could not include the value added by transportation and would have to be limited for tax purposes to the value of the product before becoming part of the export stream.

20. Significantly, the United States Supreme Court, in affirming the *Hope Natural Gas* decision, noted that this Court "indicat[ed] very definite purpose to follow rulings here" and that "[t]he plain result of [this Court's] opinion and final decree is to require that the tax be computed upon the value of the gas at the well, and not otherwise." 274 U.S. at 286, 288, 47 S.Ct. at 640.

ALBRIGHT, Chief Justice, concurring.

(Filed Jan. 12, 2006)

I write separately to make several points.

I commend the majority and concurring opinions for their careful, scholarly, and principled analysis of a difficult issue. All of the members of this Court have acknowledged that drawing appropriate and principled decisional lines in this area of law is not an easy task; and these opinions have done so.

It is appropriate to emphasize that the State of West Virginia, through our courts, our executive branch and our legislative branch, has a strong historic and present basis for appropriate regulation of our coal industry for the protection of our land and people and to promote the well-being of this industry which is a major factor in our state's economy. Likewise, the state has good reason to fairly tax the privilege of removing its nonrenewable natural resources from the ground, giving attention to the economic benefit gained by their owners, to the substantial social costs incurred by our people and our state in the process, and to the need to support an economic and social infrastructure in which the extractive industries can profitably operate.

I disagree strongly with the suggestion in the partially concurring and partially dissenting opinion by Justice Benjamin, at footnote 11, that a workable test for "in export transit" is whether there has been an "irrevocable commitment" of goods to the foreign market. The problem with this "test" is that (as Justice Benjamin's separate opinion acknowledges), any number of various events might be classified as such an "irrevocable commitment." For example, a mine might be opened with export coal production as its sole purpose, just as mines have been opened solely or primarily to serve nearby electric generating facilities. Under the suggested test, every ton leaving the coal face of such a mine could be said to be "in export transit" from the moment of its separation at the

face. In that situation, all severance taxation could be said to be constitutionally precluded.[1]

Our Legislature drew on its extensive experience with the coal industry in crafting severance taxes on coal mining. The lines the Legislature has drawn do not unconstitutionally stray into the area of taxation of goods that are merely in export transit. In fact, they are evenly applied to coal that may only move in-state, move in other domestic commerce or move in foreign commerce. They are specifically tailored to avoid taxation of any transit costs and to provide convenience to the affected taxpayers in the calculation and payment of the taxes at issue in this case.

The Legislature's decision to base the tax on the selling price of the coal, less actual transportation costs, has been criticized on the ground that it seeks to tax "value added" after the coal has been severed from the ground. I respectfully suggest that the "value added" argument is just plan erroneous. The long experience of the State of West Virginia in ascertaining the "value" of coal has taught our state that there is no easy "litmus test" of "value."

By way of example, a thick seam or a thin seam of coal may yield a product of high or low heat value, with little or very high contaminants, slate, rock, methane or other material mixed in. Calculation of "value" by weight (by ton) or by acreage prior to removal can yield wildly divergent results, at substantial variance from the true "value" of the coal. Thus, accurately measuring the "value" of the natural resource wealth being removed from the ground in the exercise of the privilege of mining coal must be seen as a difficult task. I would point out that the method chosen by the Legislature—essentially the sale price of the coal less any transportation cost—is as fair and accurate a measure as can be devised. In any event, calculation of the tax, based on "value" as defined by the

1. Coal mining and production methods can vary substantially, with loading, blending, cleaning, and re-loading occurring in difference sequences. Recognizing this situation, West Virginia tax statutes and regulations, as interpreted in *Kanawha Eagle Coal, LLC v. Tax Commissioner*, 216 W.Va.

616, 609 S.E.2d 877 (2004), draw a bright-line distinction at the completion of initial coal loading; which also, in the case of exports, corresponds to the logical beginning of an "in export transit" process.

Legislature, especially at the relatively low rate specified by the law in comparison to rates imposed in other jurisdictions, yields an eminently reasonable exercise of the state's taxing power. The further concession by the Legislature that the tax need not be calculated and paid before a sale is had constitutes an act of grace to the taxpayer and is a reasonable concession to the mining industry. This mechanism avoids imposing the tax before there is an ability to pay and likewise avoids such devices as paying "estimates" when the coal is shipped, subject to later adjustments when a "real value" is finally determined by the actual sale in the marketplace and the actual transportation costs are determined for deduction from the sale price.

Justice Benjamin's partially concurring and partially dissenting opinion disapproves of any tax on the "value added" by the coal loading process in the instant case. But the only "value added" in the loading of coal onto a rail car is the relatively minimal cost of the mechanical act of scooping up and dumping the coal into the car. A tax on the cost of "loading" is precisely what was approved in *Washington Department of Revenue v. Association of Washington Stevedoring Companies*, 435 U.S. 734, 758, 98 S.Ct. 1388, 55 L.Ed.2d 682 (1978). In any event, the revenue gained by this portion of West Virginia's severance tax must be recognized as being *de minimis* and incurred in some manner in every case, whether the coal is to be delivered in-state, in domestic commerce or in foreign commerce.

Finally, the majority opinion gives full deference to the fact that the *Richfield Oil* test has not been explicitly overruled. The opinion notes that the future viability of such a mechanistic test has been called into question by *Michelin Tire Corporation v. Wages*, 423 U.S. 276, 96 S.Ct. 535, 46 L.Ed.2d 495 (1976). Therefore, the majority of this Court properly also looked to the *Michelin* approach, which all agree is supportive of the taxes in question.

Accordingly, I concur.